No. 84,334

IN THE MATTER OF SUSAN M. SHUMWAY, *Respondent.*

(8 P.3d 735)

Opinion filed July 14, 2000.

*Frank D. Diehl,* deputy disciplinary administrator, argued the cause and was on the formal complaint for petitioner.

*Susan Shumway,* respondent, was on the brief pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Susan M. Shumway, alleging violations of Kansas Rules of Professional Conduct (KRPC) 1.1 (competence) (1999 Kan. Ct. R. Annot. 284); 1.3 (diligence) (1999 Kan. Ct. R. Annot. 294), 1.4 (communication) (1999 Kan. Ct. R. Annot. 303); 1.5 (fees) (1999 Kan. Ct. R. Annot. 312), 1.15 (1999 Kan. Ct. R. Annot. 342) (safekeeping property); 1.16 (declining or terminating representation) (1999 Kan. Ct. R. Annot. 352); 3.2 (expediting litigation) (1999 Kan. Ct. R. Annot. 362); and 8.4 (misconduct) (1999 Kan. Ct. R. Annot. 399). Respondent admitted violations of KRPC 1.15(d) and 1.16(d). After conducting a formal hearing, the panel found respondent violated KRPC 1.1, 1.15(d) (2)(iv), 1.16(d), and 8.4(d) and (g) and Supreme Court Rule 207 (1999 Kan. Ct. R. Annot. 223) (she failed to cooperate with the investigation). The panel recommends a 2-year suspension from the practice of law. We impose a 1-year suspension subject to the conditions set out herein.

Respondent appeared before the hearing panel pro se. Respondent filed exceptions to the panel's report and a brief with this court, but she failed to appear for argument. Rule 212 (Proceedings Before the Supreme Court) says: "The respondent shall appear (before this court) in person . . . ." (1999 Kan. Ct. R. Annot. 239). Respondent has not explained her failure to appear in person before this court.

We review the panel's findings on respondent's charges under a standard of clear and convincing evidence. Rule 211(f) (1999 Kan. Ct. R. Annot. 234).

Respondent is an attorney admitted to the practice of law in Kansas in 1976. The office of the Disciplinary Administrator filed a formal complaint against respondent following her representation of Matthew Froggatte.

Respondent takes exception to the panel's findings of violations under KRPC 1.1, KRPC 8.4, and Supreme Court Rule 207 (cooperation) and the panel's factors in aggravation and mitigation of discipline. Respondent also contends the appropriate discipline is an informal admonition or published censure.

## The Panel's Findings and Conclusions

The panel found:

"2.   On April 28, 1998, Matthew Froggatte contacted the Respondent by telephone regarding representation in a potential paternity action. The Respondent met with Mr. Froggatte at his place of business. As a result of their meeting, Mr. Froggatte hired the Respondent.

"3.   Mr. Froggatte initiated contact with the Respondent because the woman who was expecting Mr. Froggatte's child had expressed her intentions to leave the state shortly and to deny Mr. Froggatte the opportunity to participate in his child's life.

"4.   The Respondent indicated that she would file the paternity action and would seek a restraining order restraining the expectant mother from leaving the state until after the birth of the child. In the alternative, she would seek an order requiring the expectant mother to submit to a prenatal paternity test before leaving the state. The Respondent did not advise Mr. Froggatte that a paternity action could not be brought until after the birth of a child. She did, however, advise Mr. Froggatte that she was not certain whether the law would allow the issuance of a restraining order in such circumstances. Nonetheless, the Respondent told Mr. Froggatte that she would prepare the necessary pleadings for execution and service by May 4, 1998.

"5.   Mr. Froggatte gave the Respondent a $650.00 retainer and $42.00 filing fee. It was Mr. Froggatte's understanding that the Respondent would work at the rate of $85.00 per hour. Once the $650.00 retainer had been depleted the Respondent would send Mr. Froggatte a bill for the additional fees owed.

"6.   Also, at the April 28, 1998, meeting the Respondent told Mr. Froggatte that she worked out of a 'virtual' office.

"7.   At the hearing on this matter, the Respondent explained that by 'virtual' office she meant that she worked out of her residence that she shared with her

parents, that she was available by telephone and electronic mail, and that if she needed to personally meet with a client she made arrangements to do so at the client's place of employment or at the conference room of a local accountant.

"8.   On April 30, 1998, the Respondent cashed Mr. Froggatte's check. The check was not deposited into a trust account.

"9.   On May 4, 1998, the Respondent did not contact Mr. Froggatte as promised. Mr. Froggatte began his attempts to contact and meet with the Respondent. Meetings were scheduled via telephone messages between the two during the week of May 4, 1998. Respondent failed to keep each appointment. In fact, the Respondent never had any direct contact with Mr. Froggatte after their initial meeting on April 28, [1998].

"10.   As Mr. Froggatte was under the impression that 'time was of the essence,' he sought other counsel. On May 12, 1998, Mr. Froggatte wrote a letter to the Respondent releasing her as his attorney. Exhibit 'B'.

"11.   Mr. Froggatte's new counsel advised him that a paternity action could not be filed until after the birth of the child and that Kansas law does not provide for any sort of temporary relief to restrain the mother as contemplated by the Respondent.

"12.   On May 20, 1998, Mr. Froggatte forwarded a written complaint to the Office of the Disciplinary Administrator regarding the Respondent's conduct. Exhibit 'A.'

"13.   On May 26, 1998, Deputy Disciplinary Administrator Marty Snyder sent a letter to the Respondent regarding Mr. Froggatte's complaint. The letter requested a response within twenty (20) days. Exhibit 'C.' The Respondent failed to respond to Ms. Snyder's letter.

"14.   On July 21, 1998, a second letter was sent to the Respondent from the Office of the Disciplinary Administrator. This letter requested a response within ten (10) days. Again, the Respondent failed to respond to this letter. Exhibit 'D.'

"15.   Thereafter, this matter was docketed for investigation. In a letter dated August 5, 1998, the Respondent was notified by the Office of the Disciplinary Administrator that the matter had been docketed. This communication included a directive to respond within ten (10) days. Again, the Respondent did not respond to this letter.

"16.   The investigator, Ted Hollembeak, sent two (2) letters to the Respondent. Exhibits 'E' and 'F.' The Respondent did not respond to either letter. Additionally, Mr. Hollembeak repeatedly attempted to contact the Respondent by telephone. At one point, the Respondent's voice mail box indicated that the box was full and could not accept any additional messages. Mr. Hollembeak's secretary did receive one telephone call from the Respondent. In that contact the Respondent indicated that she would be faxing some documents to Mr. Hollembeak. Mr. Hollembeak did not receive any documents from the Respondent or any further communication from her. As a result, the investigator prepared his report without having contact with the Respondent.

"17. The Respondent neither returned the unearned retainer to Mr. Froggatte, nor established that she earned the fee. Subsequently, Mr. Froggatte was reimbursed $692.00 from the Client Protection Fund. To date, the Respondent has not attempted to make restitution to Mr. Froggatte or to the Client Protection Fund.

"18. Respondent's Exhibits 1 through 3 consist of letters from family members, friends, former clients and business associates attesting to her good character; Johnson County Mental Health records and a report from her treating social worker at Johnson County Mental Health.

"19. According to many of the individuals writing on behalf of the Respondent, she has been suffering from depression since her divorce in 1983. According to her mental health records, she reported that she had been suffering from depression since only 1996. Further, the report from her social worker states that the Respondent did not seek any treatment for her depression until July of 1999. She did not report that a disciplinary action was pending against her until after several sessions. The report stated that the Respondent was diagnosed with severe Dysthymic Disorder. According to DSM IV (Diagnostic and Statistical Manual of Mental Disorders), Dysthymic Disorder is defined as:

(A) Depressed mood for most of the day, for more days than not, as indicated either by subjective account or observation by others, for at least 2 years, and,

(B) Presence, while depressed, of two or more of the following: 1) poor appetite or overeating, 2) insomnia or hypersomnia, 3) low energy or fatigue, 4) low self-esteem, 5) poor concentration or difficulty making decisions, and 6) feelings of hopelessness, and

(C) During the 2-year period of the disturbance, the person has never been without the symptoms in Criteria A or B for more than 2 months at a time.

The social worker stated in his report that the Respondent met the criteria in every category and that her depression was the primary cause of her misconduct. Further, he states that 'Since being in therapy and on medication, Susan has been successful in transitioning from part-time secretarial work to full-time employment as an attorney. She has become more organized at home and work and is reporting a significant decrease in her symptoms. In addition, she is currently employed in a law firm providing structure and accountability. Susan will need to continue taking her medication and attending therapy, but she has demonstrated a meaningful and sustained period of success.'

"20. The Respondent has been working as a temporary para-legal for Missouri attorney, William H. Pickett, since August 27, 1999. According to his letter to the panel, Mr. Pickett was very satisfied with Respondent's work and intends to offer the Respondent a permanent position in a support staff position after November 1, 1999. In such position, the Respondent will not select cases, will not represent outside clients and will not handle client funds. According to Mr. Pickett, 'I have recommended to Ms. Shumway that the safest course for her at this time is to

not actively practice law for a period of several months until she has all of the problems she experienced in 1998 safely behind her.'

"21. The Respondent called John Moran to testify on her behalf. Mr. Moran is a gentleman that resides in Las Vegas, Nevada whom she met on the Internet. Mr. Moran was assisting the Respondent in putting her financial house in order by negotiating payment plans with Respondent's creditors.

## "CONCLUSIONS OF LAW

"Based upon the above findings of fact, the Hearing Panel makes the following conclusions of law:

"1. KRPC 1.1 requires attorneys to 'provide competent representation to a client.' Competent representation is explained as requiring 'the legal knowledge, skill thoroughness and preparation reasonably necessary for the representation.' In this case, the Respondent violated this section by advising Mr. Froggatte that a paternity action could be brought prior to the birth of a child and that there was any possible legal means of restraining a pregnant woman from leaving the state of Kansas prior to the birth of her child.

"2. KRPC 1.15(d)(2)(iv) provides that the lawyer shall 'promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.' By failing to return to Mr. Froggatte the unearned retainer and filing fee the Respondent violated this subsection.

"3. KRPC 1.16(d) provides: 'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

"In his letter of May 12, 1998, Mr. Froggatte terminated the Respondent's representation. By failing to return . . . Mr. Froggatte's property, namely his $692.00, after the representation had been terminated, the Respondent violated KRPC 8.4(d).

"4. By leading Mr. Froggatte to believe that a paternity action could be brought prior to the birth of the child or that an order could be issued restraining a pregnant woman from leaving the state, and by failing to return the client's retainer and filing fees monies, the Respondent 'engage(d) in . . . conduct that adversely reflects on the lawyer's fitness to practice law,' in violation of KRPC 8.4(g)."

"5. The Respondent violated Kan. Sup. Ct. R. 207. The Rule provides:

(a) The members of the bar or any state or local bar association shall assist the Disciplinary Administrator in investigations and such other matters as may be requested of them.

(b) It shall be the duty of each member of the bar of this state to aid the Supreme Court, the Disciplinary Board, and the Disciplinary Administrator in

investigations concerning complaints of misconduct, and to communicate to the Disciplinary Administrator any information he or she may have affecting such matters.

"In the instant case, the Respondent repeatedly failed to respond to requests to respond to Mr. Froggatte's complaint. The Office of the Disciplinary Administrator sent three letters and the investigator sent two letters. All went unanswered. The local investigator tried repeatedly to contact the Respondent by telephone. Each message, except one, went unanswered by the Respondent. The one contact made by the Respondent was to the investigator's secretary indicating that certain documents would be faxed. No documents were received. The Respondent repeatedly and intentionally failed to cooperate with the investigation."

## "RECOMMENDATIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

## "MATTERS IN MITIGATION

"(a) Absence of a Prior Disciplinary Record. The Respondent does not have a prior disciplinary record.

"(c) Personal or Emotional Problems. The Respondent has a significant history dating back to 1983 of personal, family, financial and emotional problems.

"(g) Character or Reputation. The Respondent submitted several letters from friends, family members, and former clients and business associates attesting to her good character.

## "MATTERS IN AGGRAVATION

"(b) Dishonest or Selfish Motive. The Respondent accepted a retainer and filing fee on April 28, 1998, in the total amount of $692.00 to handle a matter that does not exist in law. She has made no attempt to make restitution and according to her Answer she is willing to make restitution in the future by wage assignment. Apparently, the Respondent does not believe that she should have made restitution prior to this time and is incapable of currently making restitution voluntarily.

"(e) Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Agency. The Respondent did not cooperate with the Office of the Disciplinary Administrator and the assigned local investigator.

"(g) Refusal to Acknowledge Wrongful Nature of Conduct. According to exhibits introduced into evidence by the Respondent she has been suffering from depression since 1983. She did not seek any treatment until a few weeks prior to the instant hearing. She told her mental health providers that this condition has

only been in existence for approximately three (3) years and that she has a full-time job as an attorney when she is, in fact, working as a temporary para-legal. Her current employer agrees that she should remain in such a position for the next several months. The Respondent was unable to recognize the incompetence of her advice to her client, nor the responsibility to make restitution to her client for funds received.

"(i) Substantial Experience in the Law. The Respondent has been licensed to practice law since 1976.

"(j) Indifference to Making Restitution. See (b) hereinabove."

## "RECOMMENDATION

"In imposing a sanction after a finding of lawyer misconduct, the panel considered the following factors:

(a) the duty violated;

(b) the lawyer's mental state;

(c) the potential or actual injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

"The hearing panel has reviewed and considered Standard 4.1. Standard 4.1 provides:

"4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

"The Respondent began dealing with long-standing, significant psychological [issues] only three (3) months prior to the instant hearing. According to the Respondent's own exhibits she is not completely candid with her treating professionals. According to her own employer it is recommended that she remain in her current capacity as a para-legal until she can put her past problems behind her. The Respondent should be commended, however, for at last seeking treatment for her condition.

"The Panel makes the following unanimous recommendations:

(1) That the Respondent should be suspended from the practice of law for two (2) years;

(2) That the Respondent remain in therapy as directed by her mental health providers at Johnson County Mental Health or as designated by the Office of the Disciplinary Administrator;

(3) That the Respondent should remain current with Kansas Supreme Court fees and continuing legal education requirements.

(4) That the Respondent should make restitution to the Client Protection Fund in the amount of $692.00 within six (6) months.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator.

"Dated this 21st day of November, 1999."

## DISCUSSION

In disciplinary matters, we have a duty to examine the evidence and determine discipline. *In re Berg*, 264 Kan. 254, 269, 955 P.2d 1240 (1998). The report of the disciplinary panel is advisory only. We will adopt the report where it is amply sustained by the evidence, or not against the clear weight of the evidence, or the evidence consisted of sharply conflicting testimony. See *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 (1993).

### Respondent's Exceptions

We next review each of respondent's alleged errors in the panel's report.

### KRPC 1.1 (Competence)

Respondent first takes issue with the panel's findings of fact in relation to the KRPC 1.1 violation. Specifically, respondent argues that paragraph 4 of the panel's report, stating that the respondent indicated she would file a paternity action on Mr. Froggatte's behalf, is in error. Respondent's argument is not persuasive.

Froggatte did not know the nature of what respondent intended to file. However, it is undisputed that respondent collected a filing fee of $42 from Froggatte after they discussed filing a paternity action. This is borne out by respondent's own words: "[W]e talked about, I believe, both a paternity case in terms of establishing [his] parental rights as well as subsequently determining custody of that child." Based on this discussion and respondent's collection of a $42 filing fee, the panel could reasonably conclude that respondent said she would file a paternity action. In addition, while cross-examining Froggatte, respondent said, "I spoke with you about your need to file a sworn affidavit *to back up the petition with regard to paternity*." Respondent's request for this sworn affidavit suggests she intended to file a paternity action. Respondent also questions the finding that the necessary pleadings were to be filed by May 4, 1998. The panel's findings in paragraph 4 are supported by clear and convincing evidence.

Respondent also argues that the evidence supporting the panel's finding in paragraph 9 that she did not contact Froggatte on May

4, 1998, is not clear and convincing. We disagree. In the context of the findings, the panel is referring to the respondent's failure to contact Froggatte as promised to meet with and advise him of how to proceed with his case. Froggatte expected respondent to meet with him personally, fill out paperwork, and file the case Monday, May 4. When Froggatte did not receive a phone call from respondent by the close of business on May 4, he telephoned respondent and left a message for her. Respondent returned Froggatte's call that day or the next day. Respondent agreed that she promised to meet with Froggatte and that the meeting did not take place. Clear and convincing evidence supports the panel's finding of fact in paragraph 9.

Respondent next argues that the panel's conclusion of law that she violated KRPC 1.1 (competence) (1999 Kan. Ct. R. Annot. 284) is erroneous. The panel found that respondent violated KRPC 1.1 because she advised Froggatte that: (1) a paternity action could be filed before the birth of a child, and (2) there were legal means of restraining a pregnant woman from leaving the State before giving birth. The Disciplinary Administrator argues the panel found this violation because respondent did not adequately explain to Froggatte that these possibilities did not exist under the current state of the law.

It is respondent's contention that she informed Froggatte that bringing such an action would break new legal ground. Respondent argues she should be given leeway to be a zealous advocate and argue for the expansion or modification of existing law.

A review of the transcript lends only marginal support to respondent's position. Froggatte admitted during cross-examination by Respondent:

"What I was informed was that Judge Saschse may not require her to stay in Kansas. . . . So, to keep her in Franklin County, you did not guarantee me that, but you told me that we would get jurisdiction in Franklin County and that we would try to keep her in Kansas through—I don't know what we were going to file—and that if we—at least she would have to come back to Franklin County for further proceedings."

It is not clear, as respondent contends, that she advised Froggatte the case would break new legal ground. It is also not clear that

respondent competently advised Froggatte of the state of the law. Respondent promised to file a paternity action and seek a restraining order without conducting research on the issue. She advised Froggatte before she was aware whether there was a good faith basis to argue for the expansion of existing law.

The panel obviously concluded that respondent did not inform her client as she contends. In matters of credibility or conflicting testimony we may defer to the panel's findings. See *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 (1993); *State v. Zeigler*, 217 Kan. 748, 755, 538 P.2d 643 (1975). There is clear and convincing evidence to support the panel's finding that respondent exhibited a lack of competence in her dealings with Froggatte.

### KRPC 8.4 (Misconduct)

The panel found respondent in violation of KRPC 8.4(d) (engaging in conduct prejudicial to the administration of justice) (1999 Kan. Ct. R. Annot. 399) for not attempting to make restitution here. Respondent argues she made an offer to repay Froggatte in installments. The offer was allegedly made in a telephone message. Respondent asked Froggatte on cross-examination, "[I]s it possible that there was a telephone message from me left for you at the bank regarding trying to pay you back?" Froggatte responded, "That would have been possible." Froggatte's response suggests Respondent may have attempted to contact him concerning restitution.

Respondent's claim that she attempted to make restitution is corroborated by the testimony of John Moran, who testified for respondent. Moran helped respondent in dealing with her creditors. Moran stated respondent felt bad about owing the money but had received no response when she offered to make payments. The record does not reflect clear and convincing evidence supporting a violation of KRPC 8.4(d).

The panel also found respondent in violation of KRPC 8.4(g) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law) for failing to return Froggatte's $692 after the representation ended. Respondent's arguments that the panel erred in this finding are not persuasive. Respondent took and spent her

retainer within a matter of days and without performing any legal services for her client. Froggatte was promised prompt action—he received none. Froggatte lost precious time from respondent's dilatory response. At the time of the panel hearing, Froggatte explained that the expectant mother had left Kansas shortly after giving birth. He has pursued the mother of his child from Tennessee to North Carolina to South Carolina to Mississippi without success. There is no doubt that respondent's conduct adversely reflects on her fitness to practice law.

Respondent next argues that she did not violate the cooperation provisions of Supreme Court Rule 207 (1999 Kan. Ct. R. Annot. 223). Respondent admits she did not respond to letters from the Disciplinary Administrator and investigator. She argues, however, that her conduct was not intentional. According to respondent, she was *unable* to respond due to her clinical depression. Again, her argument fails.

Respondent repeatedly failed to respond to Froggatte's complaint. The Disciplinary Administrator's office sent three letters and the investigator sent two letters. All went unanswered. The investigator also repeatedly attempted to reach respondent by telephone. Respondent returned only one of these phone calls, in which she left a message promising to fax some documents. No documents were received by the investigator.

Clearly respondent's clinical depression was serious; however, there is nothing to suggest she was physically incapacitated. Respondent could have telephoned the Disciplinary Administrator to inform his office of her situation. She failed to do so.

Respondent also objects to the panel's paragraph 19 findings relating to her candor in reporting the history of her depression to her mental health professional. Her objection has merit. Respondent's medical records reflect that she reported that her depression problems commenced as far back as high school and have continued to the present.

## Aggravating and Mitigating Factors

The panel found three mitigating and five aggravating factors. The mitigating factors are: (1) absence of a prior disciplinary rec-

ord; (2) personal or emotional problems; (3) character or reputation (respondent supplied numerous letters of good character). The aggravating factors are: (1) dishonest or selfish motive; (2) bad faith obstruction of the disciplinary proceeding; (3) refusal to acknowledge the wrongful nature of the conduct; (4) substantial experience in the practice of law; and (5) indifference to making restitution.

Respondent argues the panel erred in finding the aggravating factors, except for number four (substantial experience in the practice of law). We agree with respondent.

First, the panel found dishonest or selfish motive as an aggravating factor because respondent "made no attempt to make restitution." (The fifth aggravating factor was "Indifference to making Restitution.") Frank D. Diehl, the Deputy Disciplinary Administrator, said, "I don't believe that indifference to making restitution would apply in that respondent is certainly not indifferent to making restitution, but is not in a position financially to do so." Respondent did attempt to make restitution, at least once. The panel hearing was on October 4, 1999. On November 5, 1999, Respondent sent a $100 money order to the Client Protection Fund. She said, "It is my intention to make monthly payments to the Fund until the entire claim has been reimbursed." She has made no other monthly payments. The Deputy Disciplinary Administrator (Mr. Diehl) in his closing argument before the panel said, "I don't see that a dishonest or selfish motive is a factor."

Second, the panel found respondent had obstructed the disciplinary process in bad faith. This conclusion is contradicted by the Deputy Disciplinary Administrator's statements in the record. Mr. Diehl said, "I don't believe that it was a bad faith obstruction of the disciplinary proceeding."

Third, the panel found respondent had refused to acknowledge the wrongful nature of her conduct. Respondent admitted two violations of the KRPC. In addition, the testimony suggested she regretted her conduct, but was (and still is) in such a financial condition that she could not make restitution.

We agree with the panel's findings as to the three mitigating factors and the aggravating factor pertaining to respondent's sub-

stantial experience in the practice of law. We question the findings as to the other four aggravating factors.

The hearing panel's report is adopted as modified by this opinion.

We find clear and convincing evidence to support the panel's findings that respondent violated KRPC 1.1, 1.15(d), 1.16(d), and 8.4(g) for her conduct in relation to the representation of Froggatte and Rule 207 in failing to cooperate with the investigation. A violation of KRPC 8.4(d), however, is not supported by clear and convincing evidence.

We next discuss the appropriate discipline in this case. At the panel hearing the Deputy Disciplinary Administrator recommended published censure. He suggested a stipulation that, before respondent could actively practice law, she notify the Disciplinary Administrator's office so that it could determine whether a plan of supervision is appropriate. The panel recommended a 2-year suspension from the practice of law with certain conditions. In reaching its recommendation, the panel reviewed section 4.12 of the Standards for Imposing Lawyer Sanctions (1991), stating: "Suspension is generally appropriate when a lawyer knows or should know that he [or she] is dealing improperly with client property and causes injury or potential injury to a client." Despite respondent's arguments to the contrary, the panel considered the proper standard.

Respondent contends that, due to her severe clinical depression, an informal admonition or published censure is the appropriate discipline. Neither sanction addresses the fundamental issues here: (1) Respondent misappropriated her client's money, and (2) respondent's ability to practice law without supervision is seriously in question.

Little discussion is necessary with respect to the first issue. Misappropriating client funds is one of the gravest offenses against the public trust a lawyer can commit. Suspension is an appropriate discipline.

As for the second issue, respondent may be on her way to a stable recovery, but nothing in the record suggests she has arrived at that point yet. The record suggests respondent has a long way to go in

terms of her psychological and financial recovery. Respondent admitted during the hearing, "I don't do very well by myself." Respondent also stated she has no intention of going back to a solo practice. Under these circumstances, the appropriate discipline should consider supervision of respondent.

At the hearing before this court Mr. Diehl recommended a 2-year suspension. He emphasized respondent's failure to appear in person as required by our Rule 212 (1999 Kan. Ct. R. Annot. 239). We are also troubled by respondent's violation of Rule 212 and the absence of any explanation for such a violation.

IT IS THE ORDER of the court that respondent be suspended from the practice of law for a period of 1 year from this date subject to the following conditions. Respondent shall during her suspension:

1. remain in therapy as directed by her mental health providers at Johnson County Mental Health or as designated by the office of the Disciplinary Administrator;

2. remain current with Kansas Supreme Court fees and continuing legal education requirements;

3. make restitution to the Lawyer's Fund for Client Protection under Rule 227 (1999 Kan. Ct. R. Annot. 411) in the amount of $692;

4. submit a plan for supervision of her practice approved by the Disciplinary Administrator.

Respondent will not be reinstated until she completes the 1-year suspension and furnishes proof of her compliance with the four conditions set out above to the Clerk of the Appellate Courts and to the Disciplinary Administrator.

IT IS FURTHER ORDERED that respondent shall comply with Supreme Court Rule 218 (1999 Kan. Ct. R. Annot. 250).

IT IS FURTHER ORDERED that this order be published in the Kansas Reports and that the respondent pay the costs of these proceedings.