No. 86,887

In the Matter of FRED W. RAUSCH, JR., *Respondent*.

(32 P.3d 1181)

Opinion filed October 19, 2001.

*Alexander M. Walczak,* deputy disciplinary administrator, argued the cause and was on the brief for petitioner.

*Charles D. McAtee,* of Topeka, argued the cause and was on the brief for respondent, and *Fred W. Rausch, Jr.,* respondent, argued the cause pro se.

*Per Curiam:* This is a contested attorney discipline case filed by the office of the Disciplinary Administrator against the respondent, Fred W. Rausch, Jr., an attorney admitted to the practice of law in the State of Kansas. The hearing panel concluded that the respondent violated KRPC 1.15 (2000 Kan. Ct. R. Annot. 360) (procedures and requirements for maintaining an attorney trust account), KRPC 4.1 (2000 Kan. Ct. R. Annot. 398) (truthfulness in statements to others), KRPC 8.4(b) (2000 Kan. Ct. R. Annot. 420) (misconduct, commit a criminal act), KRPC 8.4(c) (conduct involving dishonesty), KRPC 8.4(d) (conduct prejudicial to administration of justice), and KRPC 8.4(g) (other conduct that adversely reflects on the lawyer's fitness to practice law), and recommended suspension for 2 years.

The respondent asserts that the discipline recommended by the hearing panel is excessive. According to respondent, either published censure or the alternative of 1-year supervised probation under respondent's proposed plan is the appropriate discipline.

In addressing discipline, we discuss respondent's claims that the panel erred by: (1) granting the Disciplinary Administrator's motion in limine and (2) concluding that a civil judgment against respondent entered by a federal district court in Virginia, affirmed on appeal, was based on clear and convincing evidence.

We agree with the hearing panel's recommendation and suspend respondent from the practice of law for a period of 2 years from October 19, 2001, the date of our opinion. The respondent has

filed exceptions to some of the panel's findings. We have marked the exceptions with an asterisk:

### The Hearing Panel's Findings

"1. . . . The Respondent was admitted to the practice of law on September 28, 1949.

*"2. In March, 1994, the Respondent established a new trust account with Bank IV (now called Bank of America). The account was titled: The Kansas Bar Foundation, Fred W. Rausch, Jr. IOLTA Account . . . ."

Although the respondent takes exception, arguing that the account was opened in February 1994, he admitted to the March 1994 date in his answer to the Disciplinary Administrator's complaint. At the disciplinary hearing, the respondent testified that the Interest on Lawyer Trust Account (IOLTA) account was opened before Deerfield Holding Company, Inc., (Deerfield) was actually incorporated, but no date was given.

IOLTA accounts for clients' funds are established by the Rules of this court. KRPC 1.15(d)(3)(iii). Interest or dividends on the account are remitted by the financial institution to the Kansas Bar Foundation, Inc. KRPC 1.15(d)(3)(iii)(aa). IOLTA trust accounts are designed for funds of clients or third persons (1) that are nominal in amount, (2) that are expected to be held for a short period of time, and (3) on which interest is not paid to the client or third persons. KRPC 1.15(d)(3).

The record reflects that the IOLTA account contained the respondent's initial $500 deposit, investment funds from the Methodist Church in South Africa, and funds from Deerfield investors. Sometimes money was transferred to the Deerfield accounts or to Cecil P. Jones. Sometimes the respondent wrote checks to himself as payee out of the IOLTA account.

"3. On March 8, 1994, the Respondent filed the necessary papers with the Kansas Secretary of State's office, and incorporated Deerfield Holding Company, Inc. (hereinafter 'Deerfield'). Deerfield's office address was the same [as] the Respondent's law office address . . . . Additionally, the Respondent was listed as the Registered Agent of Deerfield.

"4. Thereafter, on March 9, 1994, the Respondent, Cecil P. Jones, and Deborah L. [Gardner-Jones] held the organizational meeting for Deerfield. At that time, 100 shares of stock were issued to the Respondent, and 100 shares of stock were

issued to Mr. Jones. The three individuals present voted that they should each be elected to serve as the Board of Directors of Deerfield. Thereafter, Mr. Jones was elected Chairman of the Board of Directors and President of Deerfield; Ms. Gardner-Jones was elected Vice Chairman of the Board of Directors and Vice President of Deerfield, and finally, the Respondent was elected as Secretary of the Board of Directors and Secretary/Treasurer of Deerfield.

"5. At a subsequent meeting of the Board of Directors, held on July 1, 1995, the members of the Board of Directors agreed to redesignate the shares of the corporation. At that time, Mr. Jones became owner of 150 shares of stock. The Respondent's ownership in the corporation was reduced to 50 shares of stock.

*"6. *Complaint of Pieter M. Van der Spuy*"

We note that Van der Spuy filed a civil complaint grounded in fraud in the United States District Court for the Eastern District of Virginia, not a Kansas disciplinary complaint.

"a. During October, 1995, Pieter M. Van der Spuy, a citizen of South Africa who now resides in Virginia Beach, Virginia, from Erich Otto, also a citizen of South Africa, learned of 'high-yield foreign investment' programs operated by Deerfield. Mr. Otto indicated that he was scheduled to meet with Anthony H. Adams about investing in Deerfield. Mr. Otto told Mr. Van der Spuy that, if he was also interested, then he would ask Mr. Adams to forward information concerning the program to Mr. Van der Spuy's attention.

"b. Mr. Van der Spuy contacted Mr. Otto indicating that he would like to have additional information regarding the investment programs. Mr. Otto provided Mr. Van der Spuy with Mr. Adams' address and telephone number. Thereafter, Mr. Van der Spuy contacted Mr. Adams by telephone. Mr. Adams provided information regarding the investment program available through Deerfield. In part, Mr. Adams assured Mr. Van der Spuy that the investment principal was fully secured against loss with letters of guarantee and that the program required the letters of guarantee to be in the possession of the trust before any monies could be released by the trustee.

"c. Later, Mr. Otto informed Mr. Van der Spuy that the Methodist Church of South Africa had invested hundreds of millions of dollars with Mr. Jones and the Respondent through Deerfield. In order to ensure the accuracy of the information that he was receiving, Mr. Van der Spuy contacted Colin Woolacott. Mr. Woolacott, the Chief Executive Officer for the Methodist Church of South Africa, assured Mr. Van der Spuy that Mr. Jones had been appointed the church's chief investment officer and that Mr. Jones was handling all of the church's investments.

"d. In deciding whether to invest with Deerfield, Mr. Van der Spuy 'investigated' the Respondent. Mr. Van der Spuy contacted bar officials in the state of Kansas. Mr. Van der Spuy was informed that the Respondent had been practicing law for approximately 40 years and had a 'clean record.'

*"e. On October 27, 1995, Mr. Van der Spuy telephoned the Respondent. The Respondent informed Mr. Van der Spuy that the funds would be secured by a pledge of securities before the funds were transferred from the trust to Deerfield."

The record conflicts here. Apparently Van der Spuy told Steve Hulsopple, of the Kansas Securities Commission, that he spoke to the respondent in October. However, at trial, Van der Spuy testified that the first time he spoke to the respondent was November 13 or 14, when he was preparing to wire the $100,000. The respondent assured him that he had known Jones for some time and that Jones was experienced in "this type of thing." Van der Spuy signed the documents received from Deerfield on November 13. At the disciplinary hearing, Van der Spuy agreed that the respondent did not personally make representations to him about a trading program.

*"f. As a result of the various conversations, Mr. Van der Spuy decided to invest $100,000 in Deerfield's investment program. Subsequently, Mr. Jones and the Respondent forwarded documents to Mr. Van der Spuy's attention. The documents included a 'Power of Attorney,' a 'Trust Agreement,' and an 'Authorization to Transfer Funds.' After a careful review of the documents, Mr. Van der Spuy executed the documents and returned the same to Deerfield."

The bulk of the documents were originally sent to Van der Spuy from Jones. After signing the documents, Van der Spuy sent them to Deerfield. First, Van der Spuy testified that he sent the documents to the Deerfield address at the respondent's law office, but then he testified that he thought he sent the documents to the Deerfield address in Georgia. He also faxed them to the Deerfield office in Georgia. Copies of the signed agreements were then sent back to Van der Spuy by Jones or the Respondent.

*"g. Thereafter, on November 14, 1995, Mr. Van der Spuy caused $100,000 to be wire transferred to the Respondent's trust account. Pursuant to instructions from Mr. Jones, on November 17, 1995, the Respondent transferred Mr. Van der Spuy's $100,000 to Deerfield . . . . Then, again, pursuant to instructions from Mr. Jones, on November 22, 1995, the Respondent wire transferred Mr. Van der Spuy's $100,000 from the Deerfield account to the personal account of Linda Flores at the National Westminister Bank in England."

The transfer was to "E.F.S., Inc. Linda Flores." The findings in paragraph g as modified are supported in the record.

*"h. At no time did the Respondent or Mr. Jones receive a letter of guarantee or a pledge of securities to protect Mr. Van der Spuy's $100,000 investment as required by the documents. Additionally, Mr. Van der Spuy's $100,000 was never placed in a 'trading program' as the documents required."

The record shows no evidence of a letter of guarantee or pledge of securities, nor is there evidence that Van der Spuy's money was placed in a trading program. Van der Spuy's money was transferred from the IOLTA account to a Deerfield account and then to an account in England (Linda Flores). The money was lost. At trial, the respondent acknowledged that he received no documentation in return for the funds he sent out in November 1995. In addition, the record shows that there apparently had been an agreement between Jones and Adams involving the transfer of Van der Spuy's money to the bank account of Linda Flores, the president of EFS, Inc.

"i. On February, 12, 1996, Mr. Van der Spuy received a return of $2,000 of his investment funds.

*"j. In March, 1996, Mr. Van der Spuy wrote three letters to Mr. Jones and the Respondent requesting information regarding his investment. In response to Mr. Van der Spuy's letters, the Respondent telephoned Mr. Van der Spuy and indicated that he would contact Mr. Jones. Mr. Jones failed to respond to the requests for information."

These facts are supported in the record.

*"k. On July 2, 1996, counsel for Mr. Van der Spuy contacted the Respondent requesting information regarding Mr. Van der Spuy's investment. The Respondent replied, disclaiming knowledge of Mr. Jones' activities and stating that all investors' monies were in the process of being returned."

Van der Spuy told this to Steve Hulsopple of the Kansas Securities Commission. The respondent acknowledged that he received inquiries from investors wanting to know where their money was.

"l. On December 26, 1996, Mr. Van der Spuy filed a complaint in the United States District Court for the Eastern District of Virginia, alleging that the Respondent, Deerfield, Mr. Jones, and Ms. Gardner-Jones engaged in fraud, breach of contract, and breach of fiduciary duty.

"m. On July 10, 1997, judgment was entered against Deerfield, Mr. Jones, and Ms. Gardner-Jones.

*"n. On January 6, 1998, after a trial to the court, the Respondent was found civilly liable for committing federal common law fraud, Virginia common law

fraud, federal mail fraud, and breach of contact. Additionally, the Respondent was ordered to pay $98,000.00, plus interest to Mr. Van der Spuy. Mr. Van der Spuy requested that the court order the Respondent to pay attorney fees incurred in the action. The following are excerpts from the findings of the United States District Court for the Eastern District of Virginia:

". . . So we have a scheme to defraud. The scheme is to get people to believe that the Kansas Bar Association, through this wonderful trust agreement with Fred W. Rausch, Jr.—and it doesn't say trust with Mr. Rausch. It keeps constantly referring to the Kansas Bar Association, as if it were overseeing this thing.

"[The wording in Deerfield's documents was c]learly designed to place trust in Mr. Rausch and cloak him with the authority of the Kansas Bar Association, clearly designed, and the instruments refer to that. And so I find that that was part of a scheme to defraud participants into believing that this particular money was going to be in trust under specific purposes with an overseer of the Kansas Bar Association.

"This agreement was drawn by Mr. Rausch, who is an attorney. It was designed to defraud people into believing that the Kansas Bar Association was a participant. And I'm looking at the trust agreement that has Mr. Rausch's initials below it and his signature on it. He knew exactly what he was doing.

". . . The trust agreement should have been between you as trustee and the individual for whom you were acting. The Kansas Bar Association was no part of any trust agreement. The account may have listed Kansas Bar Association, but this was specifically designed, and I find it was designed by you, to defraud, mislead, and deceive anybody who saw this agreement. . . .

". . . Clearly under Virginia law it is common-law fraud. Punitive damages won't serve to do much, although I think that you have some connection with this money somewhere and that you probably could put your hands on a portion of it, Mr. Rausch, because you are the only person that transferred it. I don't know where it is. It may be all gone.

"I find that you are the person who probably designed all these documents, but have no direct evidence that you designed all the instruments. I have no doubts, and no other conclusion could rationally be drawn in this case other than that these documents represent a gigantic scheme to defraud as they were carried out. They were intended to mislead a person into believing that he was making an ironclad investment overseen by the Kansas Bar Association and that the money would only be transferred under a custodial arrangement whereby it would be for his benefit, when instead, it was anything but.

". . . I think it was willful and wanton fraud."

The Virginia trial transcript was included in the record. The transcript did not explain why respondent defended at a bench trial, as opposed to a jury trial. At the disciplinary hearing, the respondent denied preparing the trust agreement and other documents.

Also, at the disciplinary hearing, James Litfin, retired vice-president of Bank IV, testified that to the best of his knowledge, the bank captioned all of the attorney accounts as "Kansas Bar Foundation" accounts. The respondent acknowledged that in some of his business literature, the word "Foundation" was incorrectly interchanged with the word "Association."

"o. Before the court ruled on the request for attorney fees, on February 3, 1998, the Respondent filed a notice of appeal. Subsequently, on August 22, 1998, the United States Court of Appeals for the Fourth Circuit affirmed the District Court's judgment in an unpublished decision. The Respondent filed a petition for rehearing and suggestion for rehearing *en banc*. The Respondent's petition was denied.

"p. Later, Mr. Van der Spuy renewed his request for attorney fees. On December 4, 1998, the District Court for the Eastern District of Virginia ordered that the Respondent pay Mr. Van der Spuy's reasonable attorney fees. Thereafter, January 15, 1999, the Respondent filed a second notice of appeal to the United States Court of Appeals for the Fourth Circuit. However, the Respondent's second appeal was dismissed on the Respondent's own motion on May 25, 1999.

"q. At some point, the Respondent and counsel for Mr. Van der Spuy agreed to reduce the judgment owed by the Respondent. As a result, the Respondent paid a total of $65,000 to Mr. Van der Spuy and his attorneys.

*"7. Complaint of Clive U. Fisher*

*"a. Clive U. Fisher also became acquainted with the Respondent, Mr. Jones, and Deerfield through Mr. Adams. Mr. Fisher agreed to invest $100,000 through Deerfield. Thereafter, on October 3, 1995, in order to effectuate the investment, Mr. Fisher provided a power of attorney to Mr. Adams. After obtaining the power of attorney, Mr. Adams signed certain documents, in [*sic*] behalf of Mr. Fisher, regarding Mr. Fisher's investment with Deerfield. The documents included a 'Letter of Intent,' 'Authorization to Transfer Funds,' 'and 'Agreement.' "

These facts are verified in the record.

*"b. The 'Letter of Intent' included the following:
'During the Program period (one (1) year and one (1) day), the funds cannot and will not be hypothecated or invaded or put at risk in any manner whatsoever without an approved principal guarantee being substituted for the funds in accordance with approved procedures, and in the approved format(s) to be defined in the Proposed Agreement, in which case the funds can be released upon [Deerfield]'s instructions.' "

The language is supported in the record.

°"c. In four wire transfers, Mr. Fisher transferred approximately $105,000 to the Respondent's trust account for investment in Deerfield's investment program. The wire transfers occurred on October 11, 1995, October 13, 1995, October 17, 1995, and October 20, 1995. Thereafter, on October 25, 1995, the Respondent, pursuant to directions by Mr. Jones, transferred $100,050 of Mr. Fisher's investment funds to Deerfield. Then, on November 13, 1995, again, pursuant to Mr. Jones' directions, the Respondent transferred Mr. Fisher's investment monies to the personal account of M.P.H. Williams at the Midland Bank PLC in England. [The record reflects the account was 'M.P.H. Williams, trustee, West Pacific Holdings, Ltd.']"

At the disciplinary hearing, the respondent testified that Adams collected a total of $300,000 from several investors, one of whom was Fisher. $35,609.10 was transferred from Barclays Bank by order of John Fitzpatrick; separate transfers of $30,000, $17,000, and $23,000 were transferred from the Standard Bank of South Africa by Casey Trading PVT Ltd. The connection between Fisher, Fitzgerald, and Casey Trading is unclear, but Fisher claimed that these monies were his personal funds.

At the disciplinary hearing, the respondent acknowledged that the $300,000 included Fisher's $100,000. $5609 was for expenses, and $100,000 was for investment. In the Authorization to Transfer Funds, which was signed by Adams, $100,000 was designated for investment. The funds were transferred from the respondent's IOLTA account to a Deerfield account and then to the Midland Bank account of M.P.H. Williams (in England), as trustee of West Pacific Holdings, Ltd. The President of West Pacific, William Frattalone, wrote Jones a letter in which he said they were delayed in placing the investments into a trading program. Apparently Jones later asked for a return of the total $300,000 investment, and Frattalone assured him that the funds would be returned. However, according to letters written by Deborah Gardner-Jones, Frattalone moved the funds to an alternate bank undisclosed to Deerfield. The respondent acknowledges that the money has never been returned.

°"d. At no time did the Respondent or Mr. Jones receive a letter of guarantee or a pledge of securities to protect Mr. Fisher's investment as required by the documents. Additionally, Mr. Fisher's investment was never placed in a 'trading program' as the documents required."

The money was transferred to the IOLTA account, to a Deerfield account, and then to an account in England. No guarantees were received by the respondent.

"e. After the contractual period of one year and one day ended, Mr. Fisher sought the return of his initial investment and the profits made during the year. Deerfield, the Respondent, and Mr. Jones failed to return Mr. Fisher's investment and profits. Thereafter, Mr. Fisher complained to the Office of the Disciplinary Administrator, the Office of the Securities Commissioner, and the Client Protection Fund.

°"8. From on or about October, 1995, through on or about January 24, 1996, approximately $721,435.23 was received by the Respondent and deposited in the 'Kansas Bar Foundation, Fred W. Rausch, Jr., IOLTA Trust Account . . .' as investment for Deerfield which was intended for investment in 'high-yield foreign investment' programs. At the hearing on this matter, the Respondent agreed that he had a fiduciary duty to protect and preserve the investment monies contained in his trust account and the Deerfield accounts."

These facts are supported in the record.

°"9. During that period of time, the Respondent wired the monies to various personal accounts as instructed by Mr. Jones. Having failed to receive a letter of guarantee or pledge of securities following the first and second wire transfers, the Respondent continued to wire transfer investor monies to personal accounts, as instructed by Mr. Jones. Due to several nefarious individuals involved, all of the investor monies were lost in various fraudulent schemes."

Van der Spuy's money was wired to the account of E.F.S., Inc.-Linda Flores, a supposed trader with Westminster Bank in London. Flores' corporation, a California corporation, was dissolved during the period that Flores was involved in an unrelated case involving fraudulent investments in 1996. It is unclear whether Flores' corporation was defunct during her dealings with Deerfield. In the pretrial order in the Virginia federal district court case, the parties stipulated that the respondent transferred the $100,000 to the Westminster Bank account for the benefit of Flores.

Fisher's money was wired to the account of M.P.H. Williams, trustee for West Pacific Holdings, Inc.

°"10. For at least two years before the Respondent had taken any investment monies into his possession, he knew that Mr. Jones and Ms. Gardner-Jones were persons of questionable financial means. In fact, at points in time, the couple had been evicted from their apartment and did not have sufficient credit to purchase or lease an automobile. On multiple occasions, the Respondent made loans to the

couple to keep them financially afloat. Despite those warning signs, the Respondent continued to act upon the mere assurances of Mr. Jones and completely failed in his duty to protect the investors' monies."

The respondent loaned money to Jones for several years. It appears that he began loaning money to Jones in 1993.

*"11. On August 7, 2000, in the District Court of Shawnee County, Kansas, the Respondent was charged with having committed deceptive commercial practices, a class B misdemeanor, in violation of K.S.A. 21-4403. Thereafter, on September 28, 2000, the Respondent entered a *nolo contendere* plea to that charge. On November 28, 2000, the District Court sentenced the Respondent to serve six months in the county jail. The District Court did not remand the Respondent to jail. Rather, the District Court placed the Respondent on supervised probation for 24 months. The District Court also ordered that the Respondent pay court costs in the amount of $103.50, a fine of $1,000, and restitution of $65,000 (to Mr. Fisher). Finally, the District Court ordered that the Respondent perform 200 hours of community service work."

In his exceptions, the respondent noted that he pled nolo contendere to one count of committing deceptive commercial practices.

### The Hearing Panel's Conclusions of Law

Based on these findings, the panel came to the following conclusions as to violations (those to which the respondent has filed exceptions are marked with an asterisk):

*"1. KRPC 1.15 establishes the procedures and requirements of maintaining an attorney trust account. Specifically, that rule provides:
'(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with **a representation** separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas . . . .'

As emphasized above, attorneys are limited in using their trust accounts for monies received in connection with 'a representation.' By using his attorney trust account as a 'mere conduit'[5] to filter the investment money through to Deerfield, the Respondent violated KRPC 1.15(a).

---

"[5] The Respondent admitted during his testimony and in previous correspondence that the trust was a 'mere conduit' to filter the investment money through to Deerfield."

318

°"2. The Hearing Panel also concludes that the Respondent violated KRPC 4.1(b). That rule provides that:

'In the course of representing a client a lawyer shall not knowingly:

. . . .

'(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by or made discretionary under Rule 1.6.'

In this case, the Respondent played many roles in the investment program. The Respondent served (1) as attorney for Deerfield, (2) as incorporator of Deerfield, (3) as registered agent for Deerfield, (4) as Secretary for the Board of Directors of Deerfield, (5) as Secretary/Treasurer of Deerfield, (6) as a shareholder of Deerfield, and (7) as trustee of the trust which initially held the monies to be invested by Deerfield in [sic] behalf of the investors. The Respondent was the sole signatory on the trust account. Additionally, the Respondent was the sole signatory of one of the Deerfield accounts. Finally, the Respondent was the only person who transferred the investors' money from the trust account to the Deerfield accounts, and from the Deerfield accounts to other accounts. Because the Respondent failed to disclose to Mr. Van der Spuy and Mr. Fisher that he played various, and at times, conflicting roles in the investment program, and because the investment program was a sham, the Respondent 'fail[ed] to disclose a material fact to [the investors] when disclosure [was] necessary to avoid assisting . . . criminal or fraudulent act[s] by [Deerfield],' in violation of KRPC 4.1(b).

°"3. Kan. Sup. Ct. R. 202 details the 'grounds for discipline,' in pertinent part, as follows:

'A certificate of a conviction of an attorney for any crime or of a civil judgment based on clear and convincing evidence shall be conclusive evidence of the commission of that crime or civil wrong in any disciplinary proceeding instituted against said attorney based upon the conviction or judgment. A diversion agreement, for the purposes of any disciplinary proceeding, shall be deemed a conviction of the crimes originally charged. All other civil judgments shall be prima facie evidence of the findings made therein and shall raise a presumption as to their validity. The burden shall be on the respondent to disprove the findings made in the civil judgment.'

In order to determine whether a civil judgment is deemed 'conclusive' or 'prime facie evidence,' the standard of proof applied in the underlying judgment must be determined.

°"4. The United State District Court for the Eastern District of Virginia, found the Respondent civilly liable for committing common law fraud, as defined by the state of Virginia. In *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 439 S.E. 2d 387 (1994), the Virginia Supreme Court stated:

'One who advances a cause of action for actual fraud bears the burden of proving by clear and convincing evidence: (1) a false representation, (2) of a material fact,

(3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'

*Id.* at 148. Thus, the standard of proof required in cases involving common law fraud, as defined by the state of Virginia is clear and convincing evidence. Because the civil judgment entered by the United States District Court for the Eastern District of Virginia and affirmed by the United States Court of Appeals for the Fourth Circuit was based upon clear and convincing evidence, the civil judgment is 'conclusive evidence of the commission of that . . . civil wrong in any disciplinary proceeding instituted against said attorney based upon the . . . [civil] judgment.'

*"5. The criminal conviction in the Shawnee County District Court is 'conclusive evidence of the commission of that crime . . . in any disciplinary proceeding instituted against said attorney based upon the conviction. . . .' Kan. Sup. Ct. R. 202.

*"6. KRPC 8.4 provides definitions of professional misconduct. In pertinent part, that rule states that it is professional misconduct to:

'(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

'(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

'(d) engage in conduct that is prejudicial to the administration of justice;

. . . .

'(g) engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.'

Based upon the civil judgment of the United States District Court for the Eastern District of Virginia, and based upon the criminal conviction from the District Court of Shawnee County, Kansas, the Hearing Panel concludes that the Respondent violated KRPC 8.4(b), KRPC 8.4(c), KRPC 8.4(d), and KRPC 8.4(g).

"7. The Deputy Disciplinary Administrator alleged in the Formal Complaint that the Respondent also violated KRPC 1.8, KRPC 3.3, and KRPC 7.5(a). The Hearing Panel concludes that the evidence does not support a finding that the Respondent violated KRPC 1.8, KRPC 3.3, or KRPC 7.5(a). Therefore, the allegations in the Formal Complaint that the Respondent violated KRPC 1.8, KRPC 3.3, and KRPC 7.5(a) are dismissed."

## DISCUSSION

The respondent takes exception to various evidentiary rulings of the hearing panel, all of the panel's substantive conclusions, and some of the panel's findings. The exceptions taken by respondent present three issues for review: (1) Did the panel err by granting the disciplinary administrator's motion in limine? (2) Should we go behind a federal district court civil judgment against respondent grounded in fraud to examine whether the judgment was based on

clear and convincing evidence? and (3) Was the panel's recommended discipline excessive?

The applicable standards of review are as follows:

" 'In disciplinary matters, we have a duty to examine the evidence and determine for ourselves the judgment to be entered. Although the report of the disciplinary panel is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony. [Citation omitted.] We apply these rules in considering the evidence, the findings of the panel, and the arguments of the parties in making our determination of whether violations of KRPC exist, and if they do, deciding upon the appropriate discipline to be imposed.

" 'Supreme Court Rule 211(f) (1997 Kan. Ct. R. Annot. 224) provides in applicable part: "To warrant a finding of misconduct the charges must be established by clear and convincing evidence." Clear and convincing evidence is defined in *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816 (1979), to mean "the witnesses to a fact must be found to be credible; the facts to which the witness testifies must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts in issue." ' " *In re Zimmerman*, 270 Kan. 855, 858, 19 P.3d 160 (2001) (quoting *In re Berg*, 264 Kan. 254, 269, 955 P.2d 1240 [1998]).

## The Motion in Limine

The respondent contends that he was denied a "full and fair due process hearing" when the panel issued an order in limine preventing him from presenting evidence in "mitigation, extenuation, and explanation" of his conduct. This contention lacks merit.

Rule 202 (2000 Kan. Ct. R. Annot. 221) says, in part:

"A certificate of a conviction of an attorney for any crime or of a civil judgment based on clear and convincing evidence shall be conclusive evidence of the commission of that crime or civil wrong in any disciplinary proceeding instituted against said attorney based upon the conviction or judgment. A diversion agreement, for the purposes of any disciplinary proceeding, shall be deemed a conviction of the crimes originally charged. All other civil judgments shall be prima facie evidence of the findings made therein and shall raise a presumption as to their validity. The burden shall be on the respondent to disprove the findings made in the civil judgment."

The Disciplinary Administrator aptly notes that the respondent was not prevented from offering mitigating evidence. Rather, the

panel's ruling attempted to prevent the respondent from mounting a collateral attack on his previous civil judgment and criminal conviction.

The respondent notes that in the formal complaint, the Disciplinary Administrator referenced the judgment entered in the United States District Court for the Eastern District of Virginia and quoted excerpts from the trial transcript. The respondent's answer to the formal complaint alleged that the Virginia judgment was erroneous for failure to comply with Fed. R. Civ. Proc. 52(a), which requires that the court make specific findings of fact and conclusions of law. He argued that the "Court's rhetoric and hyperbole do not constitute 'findings of fact' nor are they based on 'clear and convincing evidence.' "

The Disciplinary Administrator filed a motion in limine, in which he requested that the hearing panel prohibit the respondent "from testifying or eliciting testimony, or making argument, in an effort to impeach the civil judgments and decisions by the United States District Court for the Eastern District of Virginia and the United States Court of Appeals for the Fourth Circuit."

In *State v. Russo*, 230 Kan. 5, 8, 630 P.2d 711 (1981), Russo contended that he was innocent of the charges against him. We said: "[O]nce that conviction became final, it is conclusive upon this court and this court will not look behind the conviction or attempt to weigh the evidence leading to that conviction." 230 Kan. at 8.

The record shows that in the Virginia civil case, *Pieter M. Van der Spuy v. Deerfield Holding Co., Inc.; Cecil P. Jones; Deborah L. Gardner and Fred W. Rausch, Jr.*, (Case No. 2:96cv1233), the federal district court for the Eastern District of Virginia used the evidentiary standard of clear and convincing evidence in finding the respondent liable for common-law fraud. The judgment was affirmed by the Fourth Circuit Court of Appeals. (Case Nos. 98-1027 and 98-1182, filed August 12, 1998.)

In its order granting the motion in limine, the panel examined whether a collateral attack of the civil judgment and criminal conviction were admissible. Although the respondent did not specifically challenge the criminal conviction in his answer, the hearing

panel addressed that conviction in its order granting the motion in limine. Citing *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148, 439 S.E.2d 387 (1994), the panel noted that in Virginia, the standard of proof required in cases involving common-law fraud is clear and convincing evidence. It found that because the civil judgment entered by the United States District Court was based upon clear and convincing evidence, the judgment was conclusive evidence of the commission in the disciplinary proceeding against the respondent under Rule 202. It also found that the criminal conviction in Shawnee County District Court was conclusive evidence of the commission of the criminal wrong in the disciplinary proceeding. Thus, the panel concluded that collateral evidence attacking the conviction and judgment were irrelevant and inadmissible. We agree.

The respondent cites *State v. Phelps*, 226 Kan. 371, 380, 598 P.2d 180 (1979), *cert. denied* 444 U.S. 1045 (1980), where we said: "The panel hearing is a type of discovery, with lenient rules to permit respondent to present any defense he might have to the complaint." However, we rejected Phelps' claim that the panel denied him due process by denying his motion for discovery. We noted with approval *Matter of Murray*, 266 Ind. 221, 362 N.E.2d 128 (1977), an Indiana case holding denial of discovery in a disciplinary proceeding is not an unconstitutional denial of due process. 226 Kan. at 380.

The respondent also observes that in *Russo*, we cited *In the Matter of Hiss*, 368 Mass. 447, 333 N.E.2d 429 (1975), *disavowed by Aetna Casualty & Surety Co. v. Niziolek*, 395 Mass. 737, 481 N.E.2d 1356 (1985). Alger Hiss petitioned the Massachusetts Supreme Court for reinstatement to the bar. The *Hiss* court observed that Hiss' conviction and subsequent disbarment were " 'conclusive evidence of his lack of moral character at the time of his removal from office.' " 368 Mass. at 451. However, the *Hiss* court noted that "in some civil proceedings, we permit retrial of factual issues adjudicated previously in criminal cases," but it found that the situation was different in Hiss' case. 368 Mass. at 450 (citing *Silva v. Silva*, 297 Mass. 217, 218, 7 N.E.2d 601 (1937), *disavowed by Aetna Casualty & Surety Co. v. Niziolek*, 395 Mass. 737, 481

N.E.2d 1356 (1985).) The respondent fails to recognize that *Silva* and *Hiss* were reversed by *Aetna Casualty & Surety Co. v. Niziolek,* 395 Mass. 737, 742, N.E.2d 1356 (1985). *Aetna Casualty* held that "a party to a civil action against a former criminal defendant may invoke the doctrine of collateral estoppel to preclude the criminal defendant from relitigating an issue decided in the criminal prosecution." 395 Mass. at 742.

The respondent asks this court to make an exception where an attorney's license to practice law is at stake. He contends that he wanted to provide "evidence by way of mitigation, extenuation, and explanation as to his conduct," but it appears that he merely attempted to attack the federal civil judgment. Rule 202 and Kansas precedent do not permit us to look behind respondent's criminal conviction and civil judgment. The panel did not err in granting the motion in limine.

## The Hearing Panel's Recommendation of a 2-year Suspension

The respondent contends that the hearing panel failed to apply the proper standard for imposing lawyer sanctions in recommending a 2-year suspension. In other words, the respondent argues that the panel's recommended disciplinary action was excessive. We disagree.

The hearing panel made the following recommendation for discipline:

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duties to the public, to the legal system, and to the legal profession.

"*Mental State.* The Respondent knowingly violated his duties to the public, to the legal system, and to the legal profession.

"*Injury.* The Respondent's misconduct caused actual injury to third persons.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"*Selfish Motive.* The Respondent plainly testified that he remained in the Deerfield 'scheme' because he thought that this was a way for him to make a large sum of money while putting forth very little effort.

"*Pattern of Misconduct.* In this case, there were several separate investors. With regard to each of the investors, the Respondent committed similar misconduct. Accordingly, the Hearing Panel concludes that the Respondent engaged in a pattern of misconduct.

"*Multiple Offenses.* The Respondent violated KRPC 1.15, KRPC 4.1, KRPC 8.4(b), KRPC 8.4(c), KRPC 8.4(d), KRPC 8.4(g). As such, the Hearing Panel concludes that the Respondent engaged in multiple offenses.

"*Vulnerability of Victim.* The victims in this case included elderly investors who were citizens of South Africa.

"*Substantial Experience in the Practice of Law.* The Respondent was licensed to practice law in 1949. At the time he committed the misconduct, the Respondent had been practicing law for 46 years.

"*Illegal Conduct.* The Respondent engaged in illegal conduct, and, as a result, was convicted of deceptive commercial practices, a class B misdemeanor.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"*Absence of Prior Disciplinary Record.* During the Respondent's legal career, which spans 51 years, the Respondent was never previously disciplined.

"*Previous Good Character and Reputation in the Community Including Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney.* The Respondent is an active and productive member of the bar in Topeka, Kansas. He enjoys the respect of his peers, clients, and friends, and generally possesses a good character and reputation as evidenced by the testimony presented and by the many letters received by the Hearing Panel regarding the factors in mitigation.

"*Remorse.* The Respondent expressed remorse that the investors lost their money. The Respondent testified that he has continued to pursue litigation in an attempt to recover the investors' monies."

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered Standard 5.12. That standard provides, in pertinent part:

'Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.'

"The Hearing Panel unanimously recommends that Respondent be suspended for a period of two years.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

The dominant question here is whether the recommendation of a 2-year suspension is excessive. The respondent acknowledges that

his conduct "appears to be negligent and careless." However, he contends that the facts show that he was "duped, and did not knowingly or intentionally defraud or deceive anyone." He argues that the recommendation of a 2-year suspension in inappropriate, even assuming that he committed the violations as found by the panel.

The respondent points out that Van der Spuy did not file a disciplinary claim against him. However, as noted by the hearing panel, Van der Spuy did file a civil complaint against the respondent in the United States District Court for the Eastern District of Virginia. The record shows that judgment, affirmed on appeal, was rendered against respondent in favor of Van der Spuy for federal common law fraud, Virginia common law fraud, federal mail fraud, and breach of contract.

The respondent also recognizes that under KRPC Rule 202 (2000 Kan. Ct. R. Annot. 221), the Virginia civil judgment and his misdemeanor conviction in Shawnee County, Kansas, were to be considered by the hearing panel. However, he questions the appropriateness of the discipline of a 2-year suspension.

Disputing that he acted "knowingly" or that his conduct "seriously adversely" reflects on his fitness to practice law, the respondent argues that ABA Standard 5.13 provides a more appropriate form of discipline. Standard 5.13 says:

"Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

The respondent asserts that his situation is comparable to the one in *In re Kershner*, 250 Kan. 383, 827 P.2d 1189 (1992). Kershner was convicted of 4 felony violations of the Kansas Securities Act. (2 counts of violating K.S.A. 17-1254 by offering for sale shares of stock of a corporation when he was not registered as a broker-dealer or agent and 2 counts of violating K.S.A. 17-1255 by offering for sale or selling shares of stock in a corporation when such security was not registered). 250 Kan. at 383-84. Kershner also failed to file his attorney registration fees for the years 1985-90; however, the Disciplinary Administrator said that he did not perceive this failure to be a significant issue because Kershner was not practicing

law during those years. In addition, Kershner failed to appear before the hearing panel. (He said he never received notice of the hearing.) 250 Kan. at 386.

The Kershner hearing panel recommended disbarment finding that he violated the Model Rules of Professional Conduct (MRPC) 8.4(b), (c), and (g). 250 Kan. at 387. We found that the fact that Kershner was convicted of 4 felony violations of the Kansas Securities Act was sufficient to show a violation of MRPC 8.4(b). Under those facts, we concluded that since there was a violation of 8.4(b), his felony convictions could not also be "other conduct that adversely reflects on his fitness to practice law" and a violation of 8.4(g). We found no violation of 8.4(c). 250 Kan. at 388.

We acknowledged that under the facts, Kershner's convictions were not acts of violence, dishonesty, or a breach of trust or a serious interference with the administration of justice. In addition, the district court found that there were no victims to compensate. Thus, a majority found that disbarment was excessive and, instead, imposed public censure. 250 Kan. at 392.

The Disciplinary Administrator points out that we have said that comparison of past sanctions imposed in disciplinary cases gives little guidance. See *In re Bailey*, 268 Kan. 63, 64-65, 986 P.2d 1077 (1999). We evaluate each case based on its specific facts and circumstances. 268 Kan. at 65.

Here, the panel found that the respondent violated KRPC 8.4(b), (c), (d), and (g), "[b]ased upon the civil judgment of the United States District Court for the Eastern District of Virginia, and based upon the criminal conviction from the District Court of Shawnee County, Kansas." The respondent asserts that under *Kershner*, if his convictions are sufficient to show a violation of KRPC 8.4(b), the convictions cannot also be "other conduct" and a violation of KRPC 8.4(g). See 250 Kan. at 388. We agree. The Disciplinary Administrator correctly observes that *Kershner* does not hold that an attorney can *never* be found in violation of both 8.4(b) and 8.4(g). However, under the facts here, where the respondent's convictions form the basis for the alleged violations of 8.4(b) and 8.4(g), the respondent cannot be found in violation of both subsections.

## KRPC 8.4(b)

Clear and convincing evidence supports the finding that the respondent violated KRPC 8.4(b) (2000 Kan. Ct. R. Annot. 420) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer). With respect to KRPC 8.4(b), the respondent does not argue that there is no violation. He merely points out that in pleading nolo contendere, he side-stepped the threat of prosecution for three felony violations of the Kansas Securities Law, K.S.A. 2000 Supp. 17-1253. He notes that he entered a plea to deceptive commercial practice, under K.S.A. 21-4403, a class B misdemeanor in order to avoid trial. The conviction stands. It is well established that "once [a] conviction [becomes] final, it is conclusive upon this court and this court will not look behind the conviction or attempt to weigh the evidence leading to that conviction." *Russo*, 230 Kan. at 8. See *Kershner*, 250 Kan. at 390. There is no question that the civil judgment for fraud against respondent and his criminal conviction for deceptive commercial practice are sufficient to show a violation of KRPC 8.4(b).

## KRPC 8.4(d)

With respect to KRPC 8.4(d) (2000 Kan. Ct. R. Annot. 420) (engaging in conduct that is prejudicial to the administration of justice), the respondent argues that there is no violation because his conduct did not involve an attorney-client relationship. He provides no authority for this assertion. When a point is incidentally raised but not argued, it is deemed abandoned. *McKissick v. Frye*, 255 Kan. 566, 578, 876 P.2d 1371 (1994).

## KRPC 1.15

The respondent contends that he did not violate KRPC 1.15 (2000 Kan. Ct. R. Annot. 360) (safekeeping property). The panel found that the respondent violated 1.15(a), which says:

"A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with *a representation* separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas." (Emphasis added.)

The panel noted that in subsection (a), attorneys are limited to using their trust accounts for funds received in connection with " 'a representation.' " It concluded that the respondent violated the subsection because he used his attorney trust account as a " 'mere conduit' to filter the investment money through to Deerfield."

In his brief, the respondent does not deny that he used his attorney account as such a conduit. Rather, he argues that the investors gave Jones, president of Deerfield, "irrevocable, *carte blanche*" power of attorney to "direct the disposition of their funds." The respondent argues that he merely acted under the authority and direction of Jones.

The record shows that the respondent did not have an attorney-client relationship with the investors. Rather, he acted at times as the attorney for Deerfield. In addition, he was aware of Jones' personal financial struggles and had loaned him around $31,000 over a period of at least 2 years. He knew that Woolacott also loaned money to Jones. After not having received guarantees upon transfer of funds, the respondent continued to wire transfer investors' money at the request of Jones. Clear and convincing evidence supports the finding that the respondent violated KRPC 1.15(a).

## KRPC 4.1

The respondent also contends that he did not violate KRPC 4.1 (2000 Kan. Ct. R. Annot. 398). The panel found that he violated KRPC 4.1(b), which says:

"In the course of representing a client a lawyer shall not knowingly:

. . . .

"(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by or made discretionary under Rule 1.6."

The respondent argues that his actions did not involve client representation and, thus, did not constitute a violation of KRPC 4.1(b). What he fails to note is that he *did* act as an attorney for Deerfield.

As the panel pointed out, the respondent played many roles in the investment program:

"(1) as attorney for Deerfield, (2) as incorporator of Deerfield, (3) as registered agent for Deerfield, (4) as Secretary of the Board of Directors of Deerfield, (5) as Secretary/Treasurer of Deerfield, (6) as a shareholder of Deerfield, and (7) as trustee of the trust which initially held the monies to be invested by Deerfield in [*sic*] behalf of the investors."

The respondent was the sole signatory on the trust account. He was also the sole signatory on one of the Deerfield accounts. The respondent was the only person to transfer the investors' funds from the IOLTA account to Deerfield and then transfer them from Deerfield to other accounts. The panel observed that the respondent failed to disclose his various roles to Van der Spuy and Fisher. Clear and convincing evidence supports a finding that the respondent violated KRPC 4.1(b).

Under the facts, unlike the situation in *Kershner*, the respondent's convictions for fraud and deceptive commercial practice were acts of dishonesty, fraud, or deceit. The convictions also reflected adversely on his honesty and trustworthiness. The record shows that there were victims to compensate because of the illegal acts. See also *In re Lucas*, 269 Kan. 785, 786-87, 795, 7 P.3d 1186 (2000) (finding 2-year suspension was an appropriate sanction for an attorney who misrepresented to other lawyers in his putative law firm that he had closed a client trust account and then used the account to deposit attorney fees that he had agreed to share with other lawyers in the firm).

We have said: "Misappropriating client funds is one of the gravest offenses against the public trust a lawyer can commit. Suspension is an appropriate discipline." *In re Shumway*, 269 Kan. 796, 808, 8 P.3d 735 (2000) (suspending the respondent's law license for 1 year). Here, the victims were not clients. However, the respondent was a trustee for the victims and placed their funds into his IOLTA account. He then transferred the funds to Deerfield, a corporation in which he was an officer and shareholder, and to accounts in England, after which the money was lost. Given the facts of this case, a 2-year suspension is not excessive.

The panel's report is thorough and well reasoned. We find that the panel's findings and conclusions as modified herein are supported by clear and convincing evidence.

IT IS THEREFORE ORDERED that Fred W. Rausch, Jr., is hereby suspended from the practice of law in the State of Kansas for a period of 2 years from the date of this opinion.

IT IS FURTHER ORDERED that respondent shall comply with Supreme Court Rule 218(a) (2000 Kan. Ct. R. Annot. 266), and, at the end of the 2-year suspension, respondent will be reinstated upon furnishing proof of compliance thereof to the Clerk of the Appellate Courts.

IT IS FURTHER ORDERED that the costs of this proceeding be assessed to the respondent, and that this opinion be published in the official Kansas Reports.