No. 99,295

In the Matter of ROSIE M. QUINN, *Respondent*

(184 P.3d 235)

Opinion filed May 23, 2008.

*Frank D. Diehl,* deputy disciplinary administrator, argued the cause and was on the brief for petitioner.

*Rosie M. Quinn,* respondent, argued the cause pro se, and *Reginald K. Davis,* of Kansas City, was on brief for respondent.

*Per Curiam:* This is a contested, original proceeding in discipline filed by the office of the Disciplinary Administrator against Respondent Rosie M. Quinn, a Kansas City, Kansas, attorney licensed to practice in this state since 1981.

The Disciplinary Administrator filed a formal complaint against Respondent on November 30, 2006, after a complaint was received from a claims manager for Farmers Insurance Company (Farmers), followed by an investigator's audit of her attorney trust account. The formal complaint alleged that Respondent violated KRPC 1.15, 5.3 and 8.4(b), (c), and (g). At her June 7, 2007, hearing before the disciplinary panel, Respondent appeared in person and through counsel, Reginald Davis. Based upon its findings of fact, the hearing panel concluded that Respondent violated four rules of professional conduct:

KRPC 1.15(a) (2007 Kan. Ct. R. Annot. 473) (safeguard client's property; keep complete records of client trust account; no commingling of client and attorney funds in client trust account);
KRPC 1.15(b) (2007 Kan. Ct. R. Annot. 473) (promptly deliver funds to clients when entitled);
KRPC 5.3(b) (2007 Kan. Ct. R. Annot. 536) (ensure nonlawyer assistant's conduct is compatible with professional obligations of the lawyer); and
KRPC 8.4(c) (2007 Kan. Ct. R. Annot. 559) (conduct involving dishonesty, fraud, deceit or misrepresentation).

A majority of the panel recommended that Respondent be publicly censured. A minority recommended suspension from the practice of law for 6 months. Respondent filed exceptions to the panel's final hearing report and to the minority recommendation.

*Hearing Panel's Findings of Fact*

The hearing panel's findings of fact included the following:

Respondent represented J.B. in a personal injury case filed in Wyandotte County District Court against P.M. Bren Abbott represented P.M. Respondent and Abbott negotiated the settlement of the case.

On March 22, 2005, Abbott sent Respondent a letter, enclosing a check in the amount of $2,343.10 for a personal injury protection (PIP) lien, an additional check in the amount of $6,156.90 for the remainder of the settlement, a release, and a journal entry of dismissal. Abbott directed Respondent to return the release, the PIP lien check, and the journal entry after they had been appropriately executed. Abbott also wrote: "I trust that the settlement check will not be negotiated until the executed settlement documents have been returned to my office."

On March 23, 2005, J.B. signed the checks and documents in Respondent's office. The following day, the settlement check was deposited into Respondent's trust account. The day after that, the PIP lien check was deposited into Respondent's trust account.

Months later, Chad Kuntz, Farmers' State Liability Claims Manager for Kansas and Iowa, learned that the PIP lien check had been cashed in March 2005. Because Farmers never received its share of the check proceeds, Kuntz requested a copy of the check.

The check had purportedly been endorsed by Kimberly Bohannon on behalf of Farmers. Bohannon is employed by Farmers and works in Aurora, Illinois. But she did not endorse the check and did not authorize Respondent or anyone in Respondent's office to endorse the check. She had not been assigned to manage the case and had no contact with Respondent or anyone in Respondent's office regarding the case. Because the check with the purported Bohannon signature had been deposited into Respondent's trust

account, Kuntz wrote a letter about Respondent to the Disciplinary Administrator. It was received on June 15, 2005.

On June 17, 2005, the Disciplinary Administrator provided Respondent with a copy of Kuntz' complaint letter.

On June 23, 2005, Respondent sent to Abbott the journal entry of dismissal, the release, and a check in the amount of $1,562.07 for Farmers' share of the PIP lien check proceeds.

In response to the complaint from Kuntz, Respondent wrote:

"My office did receive the check payable to Farmers Insurance Company and [J.B.] The check's endorsement was apparently the result of a misunderstanding.

"From time to time, certain entities, *i.e.* Farmers Insurance Company, give me authority to sign their names to checks with the understanding that I will forward their share of the check to them.

"Part of my secretary's duties is to collect and deposit checks into my trust account. My secretary may have erroneously believed she had Ms. Bohannon's permission to sign Farmers' name to the check, which she did and deposited into my trust account.

"I did not realize the check had been deposited until I received your letter and thereafter, I sent Farmers a check for the amount of money it was entitled to."

After the Disciplinary Administrator received the Kuntz letter, investigator Robert Straub was directed to conduct an audit of Respondent's trust account. On October 23, 2005, Straub provided Respondent with a subpoena for attorney trust account records from March through October 2005. The subpoena required Respondent to deliver the records to the Disciplinary Administrator on November 28, 2005. On November 28, 2005, Gary Pettijohn, Special Investigator for the Disciplinary Administrator, agreed to allow Respondent to mail rather than deliver the documents.

Respondent failed to provide all the records required by the subpoena. On January 4, 2006, Straub wrote to Respondent, specifically directing her to provide records from March 2005, copies of the fronts and backs of deposit slips, monthly reconciliations of bank statements, individual client ledgers, and any other transaction journals or transaction ledgers used. She was to produce these documents by January 16, 2006.

In answer to Straub's January 4, 2006, letter, Respondent wrote:

"I have no deposit slips. The bank does not return them. I will request copies from March through October, 2005 and will provide them to you upon receipt.

"I don't have any check registers or monthly reconciliations of bank statements. I do not maintain client ledgers or transaction ledgers."

On May 3, 2006, Straub wrote to Respondent again, seeking additional information. Straub asked Respondent about the distribution of the settlement check in J.B.'s case:

"Farmers Insurance Company issued a check on 3/21/05 to J.B. for $6,156.90. J.B. endorsed the check and [it] was deposited into your trust account . . . . I was unable to find any distribution of these funds from your trust account to J.B. Please explain if J.B. was entitled to any of this deposit, since the check was payable only to J.B., and when distribution was made. Please include date, check number and amount distributed."

On May 23, 2006, Respondent wrote to Straub and informed him that she was unable to relate facts about the distribution of the settlement check because she could not locate J.B.'s file.

When Respondent appeared for her June 7, 2007, hearing before the disciplinary panel, she explained that she used money from her trust account to purchase a cashier's check issued to J.B. She testified as follows:

"A.   [By Respondent] Okay. What had happened was that J.B. had came in on or about March the 23rd so that he could sign those settlement checks. And at that time — remember, there are two different checks. There was one for the money that belonged to me and J.B. and there was another one for the PIP.

.  .  .  .

"A.   Now, at the time J.B. came in, you know, he signed the checks and his check was to have been deposited immediately and which it was deposited immediately. So I had gone through my settlement sheet with J.B., he approved it and then signed it. A day or two later, J.B. came back by my office and he brought me the check that I had written on March the 23rd, as well as a note, and he told me in the note that he was returning this check because he thought he was due an additional $180 primarily.

.  .  .  .

"A.   Now, I remember talking to J.B. and remember going to the bank after a while, you know, because he didn't pick up this check, and buying a cashier's check for the amount that I had initially given him plus $180. Now, I called J.B., said, 'J.B., you know I have this cashier's check that includes the $180.' But J.B. wanted copies of invoices and cancelled checks and everything that was involved in his case, and I couldn't locate all of those documents for him at that time.

"Q.   [By Mr. Diehl] In fact, isn't the file misplaced entirely?

"A.   No, I have found that file now.

.  .  .  .

"A. It had been lost for a while. But, unfortunately, sometimes in my office I have this black hole, sometimes things disappear. But if we look long enough, we can generally find them. But in any event, to answer your question about J.B., then I had gone — he didn't want the check with the additional $180 . . . . Then I went and bought him another cashier's check for even more than $180. I was just anxious for this man to get his money.

"Now, I could not find the first cashier's check I remember buying, the one with the plus $180. But the second one, I did find it. . . . And my recollection is that, you know, J.B. would not accept any money from me until I have given him copies of invoices and — and everything else that showed the cost that I had taken out of the case.

"And after the complaint had come from Farmers, of course, I sat down and I went through that file with a fine-toothed comb. We were able to locate everything that I needed to satisfy J.B. And my recollection is that I took that cashier's check that I had bought for him in April to the bank and cashed it in. Now, that's what I remember."

According to Respondent, she wrote a check made payable to J.B. in the amount of $3,514.14 on March 23, 2005. However, J.B. returned the check to Respondent because he believed he was owed an additional $180. Then, on April 27, 2005, it appears that Respondent purchased a cashier's check from Douglass National Bank for the benefit of J.B. in the amount of $3,800. It appears that the cashier's check was not negotiated by J.B. Finally, on June 23, 2005, Respondent executed a teller's check to J.B. in the amount of $3,379.40. On June 27, 2005, the teller's check cleared Respondent's account. Thus Respondent was responsible for safeguarding J.B.'s settlement proceeds from late March until June 27, 2005.

Before Respondent deposited the settlement check and the PIP lien check into her trust account, the balance of the account was only $142.35.

The activity in Respondent's trust account during March and April 2005, the period when the settlement check and the PIP lien check were deposited, included several transactions. Ultimately, Respondent distributed $4,941 of the $8,500 received in J.B.'s settlement to J.B. and Farmers. Thus, until those monies were distributed, Respondent should have maintained $4,941 in her trust account for the benefit of J.B. and Farmers. However, the same day that the PIP lien check was deposited into Respondent's trust

account, March 25, 2005, the balance of the account closed at less than she should have been holding for just that particular case. Deposits made after March 25, 2005, would have had to have been made for the benefit of other clients.

Because of Respondent's inadequate recordkeeping, it is impossible to determine whose money was being withdrawn from the trust account. Where and for what purpose Respondent initially disbursed J.B.'s settlement check proceeds and the PIP lien check proceeds is impossible to know.

In a May 3, 2006, letter to Respondent, Straub wrote:

"On June 22, 2005, you deposited a $14,000 Douglass National Bank Cashier's Check, which you identified as 'Remitter,' into your client trust account. Most of the $14,000.00 was checked out in the following days. Please explain in detail the source of the $14,000.00, the reason it was placed into your trust account, names of clients it was distributed to, and the amount to each client. Copies of documents to support this are requested."

In response, Respondent stated she had no records that related to a $14,000 deposit. Additionally, Respondent questioned Straub on how he came to have her trust account records.

Despite her inability to account for the $14,000 in May 2006, Respondent provided the following detailed explanation at her disciplinary hearing in June 2007:

"A. [By Respondent] So I cannot tell you that the $14,000 that I deposited was to pay J.B. his part of the money, because I had always separated J.B.'s money. Now, did the $14,000, any of it go towards me reimbursing Farmers of the PIP? It may have. But while we're on that $14,000 check, let me just make something clear to you. The $14,000 was not my money when it was deposited into the trust account.

"What had happened is that Mrs. B. had written a check to me for my sister, C., at C.'s request. The check was written to me. Now, Mrs. B.'s bank was Douglass State Bank, Douglass National Bank, whatever it's called now. When I took the check to Mrs. B.'s bank, I cashed it. Unfortunately, I don't have those documents with me. The bank gave them to me a few weeks ago again. That's another black hole. On Monday I wanted to try to get them again, of course they said it's going to take a little while. That's why I don't have them.

"But I remember what had happened after — after I had taken that cashier's check for $14,000 to the bank so they're able to reconstruct it all. But in any event, I actually — on the day I cashed that check for C., I actually took some cash out

for me. I actually gave C. a cashier's check what she had wanted, and I was trying my best to talk C. into letting me use that $14,000.

"Now, C. had not — sometimes she's quite eccentric. C. had not agreed to allow me to use that $14,000, and that's why I put it into that trust account. It was the safest place for it. And as C. permitted me to take that money out or use the money, that's when I got it out of that account. So —

"Q. [Mr. Diehl] Was she your client?

"A. C. is my sister.

"Q. So you put your sister's money in that account?

"A. C. is my sister. It was her money and because it was not my money, I thought it was okay to put it in the trust account to await for direction from her. But there are documents out there to verify what I'm saying, the amount of the check Mrs. B. had written, what I had done with the check. But, yes, I did put money that belonged to C. into my trust account.

"Q. Now, how — how come you didn't give Mr. Straub this explanation when he asked about it?

"A. When Mr. Straub wrote me that letter asking about the explanation for the $14,000, I searched and I could not find out any information about the $14,000. And the reason for that is in my receipt book I only put money that's client related. So when Mr. Straub wrote me a letter a year after the fact asking me to account for $14,000 that I didn't have any record for, I candidly told him that I had no recollection of where it — it came from. But as this proceeding progressed, I did think that, well, maybe if I just take it to the bank, they can tell me the source of that money, because I knew it was not my money.

"Q. But you previously testified that you knew exactly what was client money and what was your money in that trust account.

"A. Now, if Mr. Straub or anyone had asked me the source of that $14,000 a day later, a week later, or maybe even a month later, I'm sure I would have known. But not a year later. And what happens is that in situations like this from time to time I receive money that belonged to third persons for different reasons that had nothing to do with my practice of law. But because it's not client money, we never record that in my receipt book.

"But insofar as client money is concerned, anything that I get in attorney's fees, anything a client gives me for costs, all of that goes into my receipt book. And if you ask me what my client paid, I'd be able to tell you what my client paid, when my client paid, and what the money was for. But because this was a non-client, it never got to my receipt book, so I was never able to tell Mr. Straub between the time he wrote me the letter and the time I responded that — the source of that money."

Also in his May 3, 2006 letter, Straub questioned Respondent regarding a check that was made payable to cash. Respondent explained on May 23, 2006:

"Finally in response to your question #3, it is not my practice to write out checks to myself from [m]y trust account to 'cash.' Clearly that was a mistake. I would assume at this time that if a check was written to me for cash, it was retained by me personally for funds that I was entitled to."

At her disciplinary hearing before the panel, Respondent reiterated that writing a check from her trust account made payable to cash was clearly a mistake.

During the time period examined by Straub, from March 2005 through October 2005, Respondent's trust account was overdrawn twice — once in April 2005 and again in September 2005. Respondent said that her trust account was overdrawn those two times because her secretary had neglected to deposit checks received.

## Hearing Panel's Conclusions

The hearing panel explicitly stated in its report that it drew no conclusion on the formal complaint's allegation that Respondent had violated KRPC 8.4(b) (2007 Kan. Ct. R. Annot. 559), which addresses the disciplinary consequences of criminal conduct; it observed that past panels called upon to determine the merits of such a charge had been presented with evidence of a criminal conviction, and no such evidence existed here. The panel's report is silent on the formal complaint's allegation of misconduct under 8.4(g), *i.e.*, "other conduct that adversely reflects on the lawyer's fitness to practice law." 2007 Kan. Ct. R. Annot. 560.

Based upon its findings of fact, the hearing panel concluded that Respondent violated KRPC 1.15(a) and (b), KRPC 5.3(b), and KRPC 8.4(c).

KRPC 1.15 requires attorneys to properly hold and safeguard property held for clients and for third persons:

"(a)   A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

"(b)   Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except

as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." 2007 Kan. Ct. R. Annot. 473-74.

The panel concluded that Respondent's trust accounting was "unsatisfactory and essentially non-existent" and "completely insufficient to properly account for the funds held for clients and third persons," thus violating KRPC 1.15(a).

The Respondent, according to the panel, violated KRPC 1.15(b) by failing to timely forward to Farmers the money to which it was entitled. The panel regarded Respondent's violation in this regard as "particular[ly] egregious" because of a previous informal admonition directed at Respondent for a trust account violation.

With regard to KRPC 5.3(b), the panel observed, lawyers have specific ethical obligations to supervise nonlawyer assistants. The panel concluded that Respondent violated KRPC 5.3(b) by failing to ensure that her secretary properly endorsed the PIP lien check and failing to see that her secretary did not deposit the settlement and PIP lien checks prematurely.

KRPC 8.4(c) states: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." 2007 Kan. Ct. R. Annot. 559. The panel concluded Respondent violated this rule when the PIP lien check was deposited into her trust account.

"First, Respondent was not authorized to deposit that check. Mr. Abbott's instructions were to have the check endorsed and returned to his attention. Additionally, Respondent did not have permission to have the check endorsed with what purported to be Ms. Bohannon's signature. Finally, Respondent engaged in conduct involving misrepresentation when she failed to forward to Farmers its share of the PIP lien check."

### Hearing Panel's Recommendations Regarding Discipline

The hearing panel considered factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions. Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury

caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors. The panel set forth the following:

"*Duty Violated.* Respondent violated her duty to her client and the public to properly safeguard property.

"*Mental State.* Respondent knowingly violated her duty.

"*Injury.* As a result of Respondent's misconduct, Respondent caused potential serious injury."

## The panel found the following aggravating factors were present:

"Prior Disciplinary Offenses. Respondent has been previously disciplined on two prior occasions. [This shows that Respondent received an informal admonishment after a 1999 panel hearing because of commingling of personal and client funds in her trust account. At the time, the panel's report stated that it was troubled by "the Respondent's continued practice of keeping personal funds in the trust account. It does not appear that the Respondent has taken sufficient remedial action to prevent this situation from reoccurring." The panel found that Respondent's trust account had been overdrawn on 19 separate occasions and "particularly warn[ed] the Respondent to seek counsel in the appropriate maintenance of an attorney's trust account." The record also shows an informal admonishment of Respondent in 2001, when there was a delay in paying a PIP lien amount to an insurance company. In that case, an employee of Respondent's admitted converting the funds rather than purchasing a cashier's check made payable to the insurance company with trust account money.]

"Dishonest or Selfish Motive. Respondent violated KRPC 8.4(c). . . . [T]he hearing panel concludes that the misconduct included dishonest conduct.

"A Pattern of Misconduct. Respondent's system of maintaining her attorney trust account amounts to a pattern of misconduct. Respondent does not balance her attorney trust account. Respondent does not utilize individual client ledgers. Respondent relies on a receipt books (which she failed to provide to Mr. Straub) and her memory to ensure that client monies are properly safeguarded and distributed. Respondent's pattern of failing to properly administer her attorney trust account is clearly a pattern of misconduct. Further, in the 1999 hearing, Respondent testified, just as she did in this case, that she always knows how much money in her trust account is being held for her clients. The Hearing Panel finds Respondent's belief that her memory based system of accounting for client funds to be wholly inadequate and a pattern of misconduct that has, in all likelihood, occurred throughout the time Respondent has had a trust account

"Multiple Offenses. Respondent violated KRPC 1.15(a), KRPC 1.15(b), KRPC 5.3(b), and KRPC 8.4(c). . . . Respondent committed multiple offenses.

"Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted Respondent to practice law in 1981. At the time Respondent engaged in misconduct, Respondent had been practicing law for more than 20 years. Ac-

cordingly, the Hearing Panel concludes that Respondent had substantial experience in the practice of law at the time [she] engaged in the misconduct."

The panel found the following mitigating circumstances were present:

"Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct. When the Respondent received a copy of the complaint, she realized that the PIP lien check had been deposited into her attorney trust account. Within a couple of days of notification Respondent forwarded a check to [Farmers] for its share of the PIP lien check.

"Previous Good Character and Reputation in the Community, Including any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney. Respondent is an active and productive member of the bar in Kansas City, Kansas. She enjoys the respect of her peers and clients and generally possesses a good character and reputation as evidenced by several letters received by the Hearing Panel."

In addition to the above-cited factors, the panel thoroughly examined and considered the appropriate Standards for imposing discipline, specifically:

Standard 4.12: Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

Standard 4.13: Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.

Standard 8.2: Suspension is generally appropriate when a lawyer has been reprimanded for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.

Standard 8.3: Reprimand is generally appropriate when a lawyer:
    (a) negligently violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession; or
    (b) has received an admonition for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.

The Deputy Disciplinary Administrator recommended that Respondent be suspended indefinitely from the practice of law. Respondent urged informal admonishment. Based upon its findings of fact, conclusions of law, and appropriate standards, a majority of the hearing panel recommended that Respondent be censured by this court and that the censure be published in the Kansas Reports. A minority recommended suspension from the practice of law for 6 months.

## Respondent's Exceptions to the Panel Report

Respondent raises four exceptions to the panel's report. She asserts that: (1) there was no criminal or wrongful intent necessary to prove a violation of KRPC 8.4(c) when the PIP lien check was deposited into her trust account; (2) there was no clear and convincing evidence to support lack of supervision of her secretary under KRPC 5.3(b); (3) her "simple manner of managing her trust account amount" did not amount to a breach of duty to "properly hold and safeguard property held for clients and third persons" under KRPC 1.15(a), if no harm resulted to a client or to Farmers; and (4) the evidence supported neither the majority's recommendation of public censure nor the minority's recommendation of a 6-month suspension. We rule on the merits of Respondent's exceptions in the context of our discussion and disposition below.

## Discussion and Disposition

In attorney disciplinary proceedings, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties, and determines whether violations of KRPC exist. If they do, the court considers the discipline to be imposed. Any attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence. *In re Comfort*, 284 Kan. 183, 190, 159 P.3d 1011(2007); *In re Lober*, 276 Kan. 633, 636, 78 P.3d 442 (2003).

This court views the findings of fact, conclusions of law, and recommendations made by a disciplinary panel as advisory only, but it gives the panel's final hearing report the same dignity as a special verdict by a jury or the findings of a trial court. Therefore,

the panel's findings of fact will be adopted when amply sustained by the evidence and not adopted when against the clear weight of the evidence. When the panel's findings relate to matters about which there was conflicting testimony, this court recognizes that the panel, as the trier of fact, had the opportunity to observe the witnesses and evaluate their demeanor. This court does not reweigh the evidence or assess the credibility of witnesses. *Comfort*, 284 Kan. at 190. Moreover, it is not necessary to restate the entire record to show substantial competent evidence to support the panel's findings. *In re Kellogg*, 269 Kan. 143, 153, 4 P.3d 594 (2000).

Preliminary Points

Respondent seeks this court's dismissal of the formal complaint's allegation of misconduct under KRPC 8.4(b). Because the panel drew no conclusion regarding this allegation, it is now irrelevant; express dismissal by this court is not necessary. The same is true of the formal complaint's allegation of misconduct under KRPC 8.4(g), about which the panel report was silent.

KRPC 8.4(c) Misrepresentation

Respondent asserts that "it is implicit that a violation [of 8.4(c)] requires a wrongful intent on the part of the lawyer . . . . [N]either Respondent nor her secretary held any intent to act in a wrongful or improper manner." Respondent therefore concludes: "With this complete lack of evidence of the requisite mental state on the part of Respondent, a finding of misconduct on the basis of misrepresentation in violation of KRPC 8.4(c) cannot be sustained. As a result, the court should dismiss this charge against Respondent."

In support of her argument that proof of wrongful intent is required, Respondent cites six cases involving violations of KRPC 8.4(c). These cases do not support her position. The panel found that Respondent had engaged in misrepresentation. Each of the six cases she cites either had nothing to do with misrepresentation or was unclear as to which of the four types of conduct prohibited by Rule 8.4(c) — dishonesty, fraud, deceit, or misrepresentation

— was at issue. In those that may have involved misrepresentation, no intent element was discussed or demonstrated. See *In re Puriton*, 283 Kan. 880, 883, 156 P.3d 660 (2007) ("conduct that involved dishonesty"); *In re Rausch*, 272 Kan. 308, 32 P.3d 1181 (2001) ("conduct involving dishonesty"); *In re Gribble*, 261 Kan. 985, 987, 933 P.2d 672 (1997) ("conduct involving dishonesty, fraud, deceit or misrepresentation" with finding that "respondent provided false information to the Disciplinary Administrator's investigator"); *In re Wisler*, 254 Kan. 600, 602, 866 P.2d 1049 (1994) ("conduct involving deceit or misrepresentation" with no discussion or showing of intent); *In re McGhee*, 248 Kan. 988, 811 P.2d 884 (1991) ("conduct involving dishonesty, fraud, deceit and misrepresentation" with no discussion or showing of intent); *In re Wood*, 247 Kan. 219, 220, 794 P.2d 660 (1990) ("knowingly preparing and submitting false affidavits . . . and lying"). The Comment to KRPC 8.4 also does not mention a requirement of wrongful intent in misrepresentation cases. 2007 Kan. Ct. R. Annot. 560. Respondent's vehement insistence that there was no such intent is not helpful to her cause.

This exception by Respondent also appears to be directed at the panel's application of the aggravating factor of dishonest or selfish motive. Here, her aim is true. It is evident the panel felt itself compelled to find this aggravator present simply because it had already concluded KRPC 8.4(c) was violated. This is at least arguably inconsistent with its attribution of that violation only to misrepresentation, rather than dishonesty, fraud, or deceit. Respondent had testified that, before the J.B. case, Farmers authorized her to employ a procedure, albeit more promptly, similar to the one she and her secretary employed with the PIP check at issue here. According to the Respondent, Farmers' earlier authorization solved a problem with the timeliness of her fee payment; and her secretary mistakenly acted in reliance on this earlier authorization when she processed the PIP check in the J.B. case.

The Deputy Disciplinary Administrator sees the situation differently from Respondent and the panel, asserting that Respondent's conduct violating KRPC 8.4(c) went beyond mere misrepresentation. He points to Abbott's specific direction that

Respondent "have the [PIP] check endorsed and returned to his attention" and Respondent's admission that she disregarded that direction. He concluded, "[T]he hearing panel found and the exhibits show that the respondent converted Farmer's . . . portion of the check to her own use . . . . Judging from the respondent's own testimony, she was unwilling to wait for her share of the PIP proceeds because on some previous occasion she did not get her share promptly."

Although we recognize that the evidence before the panel may have supported the more sinister characterization of Respondent's conduct urged by the Deputy Disciplinary Administrator, we adopt the panel's amply supported finding of misrepresentation based on our standard of "substantial, clear, convincing, and satisfactory evidence." Proof of wrongful intent on the part of Respondent or her secretary was not required to find misrepresentation. We also adopt the panel's conclusion that Respondent's misrepresentation violated KRPC 8.4(c).

Regarding Respondent's related argument on the aggravating factor of dishonest or selfish motive, we note that neither the panel majority nor the panel minority expressed skepticism about the Respondent's credibility when she recited the story of her secretary's mistaken reliance on the earlier authorization from Farmers. Credibility is not ours to judge. We therefore believe it appropriate to give Respondent the benefit of the doubt on whether she was motivated by dishonesty or selfishness, a point to which we will return when addressing the appropriate disciplinary sanction below.

## KRPC 5.3(b) Failure to Supervise

Respondent's challenge to the sufficiency of evidence to support a violation of KRPC 5.3(b) focuses primarily on the adequacy of Respondent's *training* of her secretary. Even if we assume Respondent's statements about her secretary's training to be true, these statements are not responsive to the questions this case raises on Respondent's *supervision* of the secretary's trust account transactions and management.

Respondent admitted at one point that she did not have any reconciliations of bank statements; although this is not strictly the same as an admission she performed no such reconciliations, the proof is in the pudding. Had Respondent performed such reconciliations or supervised her secretary's performance of them, there can be little doubt Respondent would have noticed the overdrafts eventually uncovered by Straub's audit at a much earlier point. She also would have detected any delays in appropriate deposits or disbursements. The mistakes that prompted Farmers' complaint about the PIP check either would not have occurred in the first place or would have been remedied immediately.

Under these circumstances, Respondent's insistence that "there is no evidence . . . closer supervision was necessary or . . . current supervision . . . was inadequate" rings hollow. We adopt the panel's findings and conclusion on Respondent's violation of KRPC 5.3(b).

KRPC 1.15(a) Failure to Safeguard Property; Commingling

Respondent asserts that her "system of monitoring her trust account . . . has been her practice for years and . . . has worked for her." Yet Respondent admits that her trust account was overdrawn, a result of "checks written based upon an assumption that checks given to Respondent for attorney's fees had been deposited into the account. Although the balance in Respondent's trust account fell below the amount of money that belonged to Farmers, that occurred only because Respondent did not know the check had been deposited."

The first part of Respondent's statement quoted above is an admission of a breach of her duty to properly hold and safeguard property held for clients and a third party. The second part of Respondent's statement makes no sense. If Respondent did not know a check had been deposited, that should have motivated her to make and/or sanction fewer and/or smaller withdrawals from her trust account rather than enough to overdraw it several times.

Respondent also argues with regard to KRPC 1.15(a) that there was no "evidence that anyone had been harmed by Respondent's system of managing her trust account." Putting aside for today the

legal question of whether proof of such harm is required, Respondent inaccurately describes the facts before the panel and this court. Respondent admits that "Farmers did not promptly receive the funds it was entitled to." This delay constituted a harm in and of itself, regardless of whether Respondent saw to it that Farmers was paid as soon as she was contacted by the Disciplinary Administrator. That was months too late. Respondent also caused potential harm to clients whose funds were deposited in her trust account.

We also note, as did the Deputy Disciplinary Administrator: "[R]espondent testified that she held money for third persons for purposes other than her practice of law . . . . [S]he held funds not in connection with her representation as required by the rule [1.15(a)], but held the property of third persons and commingled that money with her own money and client's money."

Accordingly, we adopt the panel's findings and its conclusion on Respondent's violation of KRPC 1.15(a).

KRPC 1.15(b) Failure to Forward Money

Respondent takes no exceptions to the panel's findings and conclusion regarding her violation of KRPC 1.15(b) based on her failure to forward Farmers' money in a timely fashion. Again, the evidence in support of this violation is ample. We adopt the panel's findings and conclusion on this point.

Appropriate Discipline

Having concluded that Respondent violated KRPC 1.15(a) and (b), 5.3(b), and 8.4(c), we turn to the issue of appropriate discipline.

With the exception of dishonesty or selfishness, we adopt the panel's findings on aggravating factors present in this case. In our view, Respondent knew or should have known that she was handling her trust account improperly, imperiling client funds and harming Farmers through delay. Her casual approach to trust account transactions and recordkeeping is unacceptable. And it is compounded by her disciplinary history, which includes a previous

hearing panel's explicit admonition that she "seek counsel in the appropriate maintenance of an attorney's trust account."

On mitigating factors, we adopt the panel's findings. We note particularly that Respondent immediately and appropriately reacted to the Disciplinary Administrator's notice of the complaint letter from Farmers. Moreover, we observe that Respondent has practiced law for 26 years, often representing underserved clients in very serious matters, and she has never been disciplined for conduct implicating the quality of her representation.

In this situation, we regard a 1-year suspension from practice as necessary to impress upon Respondent the seriousness of her disregard for proper trust accounting and recordkeeping. Her approach is not harmlessly unconventional. It is dangerous to the interests of those who put their faith in her, as well as to her license to practice. The fact that Respondent's trust account has not caused more serious difficulties to this point has been a matter of grace, not design.

This being said, Respondent's many years of service to those who can afford to pay little or nothing in attorney fees, the other mitigating factors, and the benefit of the doubt we are willing to extend on the aggravator of dishonesty or selfishness counsel a certain flexibility. Respondent's service, praised in several letters of support from peers and community members, motivates us to suspend imposition of Respondent's 1-year suspension for a period of 3 years from the date of filing of this decision, provided Respondent complies to this Court's satisfaction with the following conditions:

(1) Respondent must secure within 30 days of the date of the filing of this decision a volunteer supervising attorney acceptable to the Disciplinary Administrator. The volunteer supervising attorney must agree in writing within 45 days of the date of the filing of this decision that he or she will assist Respondent in setting up an appropriate trust account, and in maintaining that account and keeping necessary records concerning it for 3 years from the date of the filing of this decision;

(2) Respondent must provide all trust account records for examination by the Disciplinary Administrator on April 1 of

each of the 3 years following the date of the filing of this decision. This requirement is in addition to those imposed by KRPC 1.15(d)(2)(v) (2007 Kan. Ct. R. Annot. 473) and Supreme Court Rule 216A (2007 Kan. Ct. R. Annot. 329), which govern other trust account compliance examinations by the Disciplinary Administrator or his representative;

(3) Respondent must be free of violations of the Kansas Rules of Professional Conduct related to her handling and record-keeping for her trust account for a period of 3 years from the date of the filing of this decision.

At the expiration of 3 years from the date of the filing of this opinion, the Disciplinary Administrator shall report in writing to this court whether, in his opinion, Respondent has complied with these three conditions. If the court determines that she has done so to its satisfaction, it shall lift the sanction of the 1-year suspension. If at any time in the 3 years the Disciplinary Administrator should report in writing to this court that Respondent has failed to abide by any or all of these three conditions, this court shall issue an order to show cause why Respondent's license to practice law should not be immediately be suspended for 1 year. Respondent shall have 20 calendar days to respond in writing to the order to show cause; no further written or oral arguments by the Respondent to this Court shall be permitted.

IT IS THEREFORE ORDERED that Rosie M. Quinn be sanctioned by the imposition of a 1-year suspension if the conditions listed are not complied with to the court's satisfaction. A minority of the court would impose a more severe sanction.

IT IS THEREFORE ORDERED that this opinion be published in the Kansas Reports and that the costs of these proceedings be assessed to Respondent.