IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,047

In the Matter of MARK R. SINGER,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed October 10, 2014. Two-year suspension.

*Kimberly L. Knoll*, Deputy Disciplinary Administrator, argued the cause and was on the brief for the petitioner.

*Daniel F. Church*, of Morrow Willnauer Klosterman Church, L.L.C., of Kansas City, Missouri, argued the cause and was on the briefs for respondent; *Mark R. Singer*, respondent, argued the cause pro se and was on the briefs.

*Per Curiam*:  This is a contested original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Mark R. Singer of Overland Park, an attorney admitted to the practice of law in Kansas in 1975.

On August 16, 2013, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on September 9, 2013. On November 20, 2013, the parties entered into a written joint stipulation of facts. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on November 20, 2013, where the respondent was personally present. The hearing panel determined that respondent violated KRPC 4.1(b) (2013 Kan. Ct. R. Annot. 617)

1

(truthfulness in statements to others) and 8.4(c) (2013 Kan. Ct. R. Annot. 655) (engaging in conduct involving misrepresentation).

Upon conclusion of the hearing, the panel arrived at the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"5.     The respondent represented BQI, LLC, the buyer in a real estate transaction involving the Delaney House and Country Inn & Suites, Holyoke, Massachusetts. Finance California, Inc. agreed to loan $3 million to BQI for the purchase. Lorraine Halica with Lawyers Title Insurance Corporation served as the escrow agent for the sale.

"6.     On behalf of BQI, the respondent received loan transaction documents, reflecting a $3 million transaction. The respondent prepared real estate transaction documents to reflect a transaction price of $10.9 million, which included assumed debt and balance of the purchase price. However, the actual price was $9 million.

"7.     In a consulting agreement, BQI agreed to pay the seller $1.9 million for services and that was included as part of the real estate transaction. However, the $1.9 million was not paid by BQI to the seller. The $1.9 million was a credit.

"8.     During the preparation of the closing statement, the respondent directed Ms. Halica to not disclose the consulting agreement on BQI's closing statement, pursuant to BQI's instructions. Subsequently, during the disciplinary investigation, the respondent stated:

'. . . Later, consistent with the agreement between Seller and Buyer, I indicated to the escrow agent in anticipation of closing, the Seller's counsel confirmed, that by virtue of the management

2

agreement/consulting agreement, Seller would be deemed to have received $1,900,000 of the purchase price through that agreement. At the request of my client, I requested that the escrow agent not reflect on the closing statement that $1,900,000 of the "amount due from Buyer" was deemed paid by the management agreement/consulting agreement. I advised my clients that they should not expect the escrow agent to agree to that and that, notwithstanding the confidentiality direction, somehow the lender would inevitably discover that Buyer had not delivered $1,900,000 in cash to the closing, with resulting ramifications. I indicated that, if asked, I would provide accurate copies of the questionable documents to the requestor. Through the combination of occurrences including the escrow agent's acquiescence to the request about reflecting the credit on the closing statement and what may have been the lack of diligence on the part of lender's counsel (there are alternate explanations), the closing occurred as my clients wanted it to.'

Additionally, the respondent testified that he directed Ms. Halica to change the wording of the closing statements from 'cash due' to 'amount due.'

"9. The respondent knew that Finance California required BQI to contribute equity to the purchase. Regarding this issue, the United States District Court specifically found:

'Both Ms. Halica's and Mr. Singer's testimony supported the conclusion that Ms. Halica was the passive tortfeasor, and Mr. Singer the active one. Ms. Halica testified that she did not know and had no reason to know that showing a cash contribution rather than a credit on the Buyer's closing statement was a material alteration; and that she "had no knowledge that there was anything being hidden" from Finance California. Ms. Halica also testified that if she had even an inkling that the Consulting Agreement was illusory, or that she was being asked to facilitate a fraud, she would have contacted her superiors and not gone forward with the closing. Moreover, Mr. Singer testified that he was

3

aware of Finance California's requirement that the Buyer contribute equity to the purchase, and that his instructions to Ms. Halica were motivated in part by a concern that Finance California would find out about the Consulting Agreement. Mr. Singer admitted that he sent an email to Ms. Halica that stated affirmatively that the information which he had asked her to keep confidential "shouldn't matter" to the lender— and would only matter to a lender that was "a vulture." It was uncontroverted that Mr. Singer himself—who knew about Finance California's equity requirement—communicated the misleading closing statement to Finance California's representatives without telling Finance California or its attorney about the credit. Mr. Singer's testimony clearly demonstrated that he, rather than Ms. Halica, was in total control of the situation, that he manipulated the situation for his client's benefit, and that he purposely kept Ms. Halica in the dark. When Third-Party Plaintiffs' counsel suggested that Mr. Singer "just kept leading [Ms. Halica] on" and that Ms. Halica was "just marching along with [his] instructions about how to show [the credit]," Mr. Singer admitted, "Well, I guess that's true."'

*Lawyers Title Ins. Corp. v. Singer*, 792 F. Supp. 2d 306, 311-12 (2011) (citations to record omitted).

"10.     In the agreement, BQI had an option to terminate the consulting agreement within the first 6 months for a termination fee of $95,000. BQI and the seller agreed to that term.

"11.     On August 9, 2002, the transaction closed. That same day, BQI terminated the consulting agreement. After the consulting agreement was terminated, the only equity that BQI contributed was a $50,000 initial deposit.

"12.     Approximately 1 month after closing, Finance California, assigned the mortgage to a third-party. Shortly thereafter, BQI defaulted on the loan and the senior lienholders foreclosed on the mortgage.

4

"13.     BQI did not have sufficient equity to satisfy Finance California's subordinate mortgage.

"14.     Lawyers Title Insurance Corporation sued Finance California. Additionally, Lawyers Title Insurance Corporation filed a third-party claim against the respondent on a claim for indemnification. In the third-party claim, Lawyers Title Insurance Corporation alleged fraud, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, breach of contract, and intentional breach of contract.

"15.     Prior to trial, the court ordered all parties to attend mediation. The respondent did not appear in person, but rather allowed his attorney to appear on his behalf. All parties reached a settlement except for the respondent. The case against the respondent proceeded to jury trial.

"16.     On February 10, 2011, the jury returned its verdict. In returning its verdict, the jury made a number of findings, detailed in its verdict form.

"17.     Specifically, the jury found clear and convincing evidence that the respondent made a false statement to Ms. Halica about an existing fact, or omitted to state a material fact, while Ms. Halica was acting as escrow agent. The jury found clear and convincing evidence that the respondent knowingly made the false statement or material omission; or that the respondent made the statement or omission with reckless disregard for the truth of the matter. The jury also found clear and convincing evidence that the respondent made the statement or omission in order to induce Ms. Halica to act in reliance on it. Additionally, the jury found clear and convincing evidence that Ms. Halica did rely on the respondent's false statement or omission in the course of her duties as escrow agent, and that this reliance was justified. The jury found a preponderance of evidence that Finance California was injured by its reliance on the respondent's false statement or omission. The jury further found, by a preponderance of evidence, that the respondent's fraud—whether by false statement or omission—was the direct and immediate cause of Finance California's injury. Also, the jury found by a preponderance of evidence that the respondent was in control of the events that led to Finance

5

California's injury. The jury found that by a preponderance of evidence that Finance California did not know of the respondent's wrongful conduct, that it had no reason to anticipate his wrongful conduct, and that it was reasonable for it to rely on the respondent not to engage in the wrongful conduct. The jury also found by a preponderance of the evidence that Lawyers Title Insurance Corporation and Ms. Halica were potentially liable to Finance California for the claim of breach of fiduciary duty. The jury found by a preponderance of the evidence that the settlement amount paid by Lawyers Title Insurance Corporation and Ms. Halica ($1.7 million) was reasonable under the circumstances. Finally, the jury found $1.7 million in damages.

"18.    As a result of the jury's verdict, on February 11, 2011, the United States District Court for the District of Connecticut entered a judgment against the respondent in the amount of $1.7 million.

"19.    The respondent filed a motion to set aside verdict and a corrected motion to set aside verdict. On May 16, 2011, the United States District Court for the District of Connecticut considered and denied the respondent's motion. In its opinion, the court stated:

> 'The jury heard Mr. Singer testify that on three separate occasions, he instructed or reminded Ms. Halica to take actions that served to conceal the fact of the credit from Finance California. Mr. Singer admitted that as an escrow agent, Ms. Halica had obligations to all the parties to the Loan Transaction—including Mr. Singer's clients—and that it was part of her duties to take instructions from Mr. Singer.'

*Lawyers Title Ins. Corp. v. Singer*, 792 F. Supp. 2d 306, 311 (2011) (citations to record omitted).

"20.    The respondent appealed from the judgment to the United States Court of Appeals for the Second Circuit. On February 4, 2013, the Second Circuit Court of Appeals affirmed the judgment, finding:

6

'UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED.

'Third-Party-Defendant-Appellant Mark Singer ("Singer") appeals from the jury verdict, rendered February 10, 2011, finding in favor of Third-Party-Plaintiffs-Appellees, Lorraine Halica ("Halica") and Lawyers Title Insurance Co., and the district court's May 16, 2011, ruling and order denying his Rule 50(b) and Rule 59 motions. We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review.

. . . .

'The district court properly determined that Singer failed to satisfy the high standards required to overturn a jury verdict. Quite simply, the record contains ample evidence in support of Halica's position advanced at trial that she was a passive tortfeasor deserving of common law indemnification from the active tortfeasor, Singer, who committed fraud. Halica testified that she had no knowledge that the consulting agreement was illusory, and that she "had no knowledge that there was anything being hidden" from Finance California ("Finance California"). Singer, on the other hand, testified that he was aware of Finance California's requirement that the buyer contribute cash at closing, and that he nonetheless instructed Halica to keep confidential the undisclosed "credit" provided by the buyer from the valueless consulting agreement between the buyer and the seller. This direct testimony permits a reasonable jury to conclude, based on the evidence of Singer's fraud and manipulation of Halica and the charge given to the jury, that Singer had the requisite control of the transaction sufficient to support the jury's award of indemnification under Connecticut law.

7

'We have considered all of Singer's other arguments and found each of them to be without merit. Accordingly, the judgment of the district court is hereby AFFIRMED.'

"*Conclusions of Law*

"21. Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 4.1(b) and KRPC 8.4(c), as detailed below.

"KRPC 4.1(b)

"22. Lawyers are required to be truthful in their statements to others.

'In the course of representing a client a lawyer shall not knowingly:

. . . .

(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by or made discretionary under Rule 1.6.'

KRPC 4.1(b). In this case, the respondent failed to disclose a material fact to Ms. Halica and the disclosure was necessary to avoid assisting his client, BQI, in a fraudulent act. Thus, the hearing panel concludes that the respondent violated KRPC 4.1(b).

"KRPC 8.4(c)

"23. 'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent's conduct in this case was dishonest, fraudulent, and deceitful. In order to avoid detection, the respondent directed Ms. Halica [to] refrain from putting certain information in the closing statement. Further, the respondent changed the language of 'cash' due to 'amount'

8

due in the closing documents. The respondent's word-smithing is further evidence of his fraudulent conduct. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"24.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"25.    *Duty Violated*.  The respondent violated his duty to the public to maintain his personal integrity.

"26.    *Mental State*.  The respondent intentionally violated his duty.

"27.    *Injury*.  As a result of the respondent's misconduct, the respondent caused actual injury to the lender and to the title company.

"Aggravating and Mitigating Factors

"28.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"29.    *Dishonest or Selfish Motive*.  The respondent's conduct was motivated by dishonesty.

9

"30.     *Substantial Experience in the Practice of Law*.  The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1975. At the time of the misconduct, the respondent had been practicing law for more than 25 years.

"31.     *Indifference to Making Restitution.*  To date, the respondent has not made any payments toward restitution nor has he set aside any funds for the payment of restitution.

"32.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"33.     *Absence of a Prior Disciplinary Record.*  The respondent has not previously been disciplined.

"34.     *The Present and Past Attitude of the Attorney as Shown by the Attorney's Cooperation During the Hearing and the Attorney's Full and Free Acknowledgment of the Transgressions.*  The respondent entered into a written joint stipulation of facts.

"35.     *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney.*  Ms. Kellee P. Dunn-Walters testified about the respondent's good character and reputation.

"36.     *Imposition of Other Penalties or Sanctions.*  The court entered a judgment against the respondent in the amount of $1.7 million.

"37.     *Remorse.*  At the hearing on the formal complaint, the respondent appeared remorseful for having engaged in the misconduct.

"38.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

10

'5.11    Disbarment is generally appropriate when:

(a)    a lawyer engages in serious criminal conduct a
        necessary element of which includes
        intentionally interference with the administration
        of justice, false swearing, misrepresentation,
        fraud, extortion, misappropriation, or theft; or
        the sale, distribution or importation of controlled
        substances; or the intentional killing of another;
        or an attempt or conspiracy or solicitation of
        another to commit any of these offenses;

(b)    a lawyer engages in any other intentional
        conduct involving dishonesty, fraud, deceit, or
        misrepresentation that seriously adversely
        reflects on the lawyer's fitness to practice.

'5.12    Suspension is generally appropriate when a lawyer knowingly
        engages in criminal conduct which does not contain the elements
        listed in Standard 5.11 and that seriously adversely reflects on
        the lawyer's fitness to practice.

'5.13    Reprimand is generally appropriate when a lawyer knowingly
        engages in any other conduct that involves dishonesty, fraud,
        deceit, or misrepresentation and that adversely reflects on the
        lawyer's fitness to practice law.

. . . .

'7.2    Suspension is generally appropriate when a lawyer knowingly
        engages in conduct that is a violation of a duty owed as a
        professional and causes injury or potential injury to a client, the
        public, or the legal system.'

11

"39.     At the hearing on the formal complaint, the deputy disciplinary administrator recommended that the respondent be suspended for a period of 1 year and following the period of suspension, the deputy disciplinary administrator recommended that the respondent's practice be supervised for a period of 2 years. The respondent requested that he be granted probation and be subject to the terms and conditions of probation set forth in his proposed probation and supervision plan.

"40.     Kan. Sup. Ct. R. 211(g)(3) sets forth the requirements that must exist before a hearing panel may recommend that a respondent be placed on probation:

'(3)     The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)      the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)     the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

(iii)    the misconduct can be corrected by probation; and

(iv)     placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

Kan. Sup. Ct. R. 211(g).

"41.     While the respondent provided a substantial, detailed, and workable plan of probation and the respondent implemented the plan of probation prior to the hearing on the formal complaint, the misconduct in this case cannot be corrected by probation and it is not in the best interests of the citizens of the State of Kansas to place the respondent on probation in this case. Thus, the hearing panel concludes that probation is not appropriate in this case.

"42.     Engaging in conduct that involves dishonesty, fraud, and misrepresentation is serious misconduct and calls for serious discipline. The hearing panel studied the ABA Standards for Imposing Lawyer Sanctions and concluded that Standard 5.11(b) appears to apply in this case. Standard 5.11(b) suggests that disbarment is the appropriate discipline to impose. However, in this case, the respondent presented compelling evidence of mitigating circumstances and based upon those mitigating circumstances, the hearing panel concludes that a period of suspension is appropriate.

"43.     The hearing panel turned to *In re Rausch*, 272 Kan. 308, 32 P.3d 1181 (2001), for guidance. In that case, the respondent had been convicted of a misdemeanor crime, deceptive business practices, and had a civil fraud judgment entered against him. As a result of that misconduct, the Kansas Supreme Court entered an order suspending Mr. Rausch for a period of 2 years.

"44.     Based upon the similarities between the respondent's misconduct and Mr. Rausch's misconduct, the hearing panel unanimously recommends that the respondent be suspended from the practice of law for a period of 2 years.

"45.     Further, because dishonest conduct cannot be corrected by probation, the hearing panel concludes that a period of supervision following the period of suspension would serve no purpose. Finally, the hearing panel recommends that, prior to applying for reinstatement, the respondent make a good faith effort to obtain a satisfaction of judgment.

"46.     Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, the discipline that should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2013 Kan. Ct. R. Annot. 356). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of the hearing before the panel and the hearing before this court.

The respondent filed exceptions and amended exceptions to the hearing panel's final hearing report, but these did not challenge the basic factual findings or legal conclusions of the panel. In addition, his brief to this court made no argument in support of the exceptions to the findings of fact and conclusions of law. See *In re Johanning*, 292 Kan. 477, 486, 254 P.3d 545 (2011) (a respondent who does not advance arguments in a brief to this court that support exceptions to the final hearing report is deemed to have abandoned the exceptions). Its arguments and authorities were limited to the subject of the discipline to be imposed.

We adopt the findings of fact and conclusions of law of the hearing panel, unamended by respondent's suggested additions in his exceptions and amended exceptions. Clear and convincing evidence—among it, the parties' written joint stipulation and the Connecticut jury verdict affirmed by the Second Circuit on appeal—demonstrates that respondent violated KRPC 4.1(b) and 8.4(c).

Respondent sought a panel recommendation of supervised probation, and he continues to seek that discipline before this court. The panel expressed an unwillingness to recommend such a sanction because of the general rule that fraudulent behavior is not amenable to correction by probation. We agree with this general rule, although there may be particular situations in which it does not apply. This case does not present one of those particular situations. Respondent's conduct here was deceitful; and we are not persuaded by his counsel's or his own statements before this court that probation is an appropriate response to that conduct. We agree with the panel's ultimate recommendation that a period of suspension is necessary.

We therefore hold that respondent should be suspended from the practice of law in Kansas for a period of 2 years from the filing of this opinion. He shall not be subject to a reinstatement hearing under Supreme Court Rule 219 (2013 Kan. Ct. R. Annot. 407).

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Mark R. Singer be suspended for 2 years from the practice of law in the State of Kansas, effective on filing of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2013 Kan. Ct. R. Annot. 300).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2013 Kan. Ct. R. Annot. 406).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1] **REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 111,047 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.